(592 P 2d 103)

No. 49,497

DORA C. COLEMAN, *Appellant,* v. THE BROTHERHOOD STATE BANK, *Appellee.*

Opinion filed March 16, 1979.

*Robert W. Fairchild,* of Norwood, King & Fairchild, of Lawrence, for appellant.

*Thomas L. Theis,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, for appellee.

Before MEYER, P.J., ABBOTT and SPENCER, JJ.

ABBOTT, J.: This is an appeal by the plaintiff, Dora C. Coleman, from a jury verdict in favor of the defendant, The Brotherhood State Bank, in an action to recover monies paid by the defendant bank as a result of alleged unauthorized signatures on checks and savings account withdrawal orders.

The checking account was opened by plaintiff on July 12, 1965, under the name of D. C. Johnson. After plaintiff's marriage to Isaiah Coleman in 1966, the account was changed to D. C. Coleman. Isaiah Coleman's name was never added to the account and the signature card authorized the defendant to recognize only the signature of D. C. Coleman on checks.

On March 18, 1969, plaintiff opened a passbook savings account. Due to a typographical error, the passbook was issued in the name of *C. D.* Coleman. The signature card authorized the bank to honor only the signature of *D. C.* Coleman. A duplicate passbook was issued to plaintiff on January 20, 1972, reflecting a correct balance of $8,669.23. Plaintiff testified she put the passbook in a locked steel box in her closet and did not see it again for

a year. The bank mailed passbook savings account statements to its customers once a year, and concedes that plaintiff would not have received a statement between the date she received the duplicate passbook and the date she discovered the savings account balance had been reduced to $121.66. A day earlier, on January 20, 1973, plaintiff learned that substantial sums had been withdrawn from her checking account.

Plaintiff testified that she had made no deposits to or withdrawals from the savings account between the date she received the duplicate passbook and the date she discovered the unauthorized withdrawals, and that no one else had been authorized by her to do so.

At trial, checks totaling $7,620.20 were introduced into evidence, and plaintiff testified she had not signed them nor had she authorized anyone to sign them on her behalf. She also introduced withdrawal orders from her savings account totaling $8,890 which she claimed bore her unauthorized signature.

The plaintiff testified that she first became aware of the problem on January 20, 1973, when she called the bank to find out the amount of her balance and became concerned when she was informed her balance was very low. She immediately went to the bank and learned that the bank was processing checks at that time that she had not written and which named her husband as payee. Upon returning home, she found that her passbook was missing. She testified that when she confronted her husband, he stated, "It is all gone. I spent it all. And here it [the passbook] is." He also allegedly admitted having forged numerous checks on her account. While the Colemans were subsequently divorced, criminal charges were not filed against Isaiah Coleman as a result of his alleged misuse of plaintiff's funds.

The record reveals the checking account was an economy check plan in which a service charge of ten cents per check was made. Account statements were rendered approximately once every three months. Mrs. Coleman testified she did not keep an accurate record of the checks she wrote and that she recorded only a few of them in the check register. She stated that she had not received a bank statement during all of 1972, but that she was not concerned as she knew she had a large balance and her employment check went to the bank each week. However, bank employees testified that plaintiff stated to them that she did receive the statements

and noticed some discrepancies, but trusted the bank to work things out and didn't report anything to the bank. We note plaintiff introduced cancelled checks that were presumably included in two separate bank statements to her—a fact which the jury may have considered in its deliberations.

The checks which plaintiff claimed to have been forged by Isaiah were written for different amounts and to different parties, although most of the money was paid out on checks drawn to the order of Isaiah Coleman. While the defendant bank did not concede the signatures were forgeries, neither did it offer evidence that the signatures were genuine other than the testimony of its employees that the signatures were reasonable facsimiles of plaintiff's signature and were such that a bank employee would not be put on notice from the signatures alone that the checks should not be paid. All the witnesses agreed that the signatures were very similar but not identical to the known signature of Dora Coleman on the signature card. The bank employees testified that signatures vary from day to day and that discrepancies were normal. Checks with plaintiff's admitted signature were offered by plaintiff to show her signature, and they also differed significantly from the signature card. Other evidence will be reviewed as the various issues are considered.

Plaintiff first contends the trial court did not properly instruct the jury. The objections go to the party's burden of proof under the applicable Uniform Commercial Code section and an instruction concerning banking custom. When the sufficiency of instructions is tested on appellate review, the instructions must be considered in their entirety. *Van Hoozer v. Farmers Insurance Exchange,* 219 Kan. 595, 549 P.2d 1354 (1976). When this is done, and it is determined that the substance of the rejected instruction was adequately covered elsewhere, both as to plaintiff's theory and as to the law, error cannot be predicated on the refusal to give a different instruction. *Plains Transport of Kansas, Inc. v. Baldwin,* 217 Kan. 2, 535 P.2d 865 (1975); *Grohusky v. Atlas Assurance Co.,* 195 Kan. 626, 408 P.2d 697 (1965).

Finally, in examining instructions, the Supreme Court has enunciated three principles which have application here: (1) Instructions should be impartial, accurate statements of the law and drawn with careful attention to supporting authorities; (2) they should be stated in brief, simple language that would be

understandable to laymen; and (3) they should be general instructions adaptable to varying circumstances. *Schwartz v. Western Power & Gas Co., Inc.,* 208 Kan. 844, 854, 494 P.2d 1113 (1972).

Plaintiff's proposed instruction dealing with the shifting burden of proof was an effort to tie the various elements together in one intelligible instruction. The instruction proposed by plaintiff appears to be fairly accurate and well-drawn. However, when the instructions given are considered in their entirety, as we are required to do (*Van Hoozer v. Farmers Insurance Exchange,* 219 Kan. at 614), they adequately cover the shifting burden of proof. While plaintiff is entitled to instructions which clearly and accurately state the law, she is not entitled to perfect instructions. The court's instructions are taken directly from the law and are not so erroneous as to warrant a reversal.

The court also gave an instruction concerning the weight the jury should give to banking customs in formulating a standard of reasonable care. Plaintiff argues that as this case is governed by the Uniform Commercial Code, the customs of other community banks are therefore irrelevant and an instruction dealing with them serves only to confuse the jury and introduce error. Plaintiff's objection to the instruction at trial was a general objection; therefore, our scope of review is limited to a determination of whether the instruction is "clearly erroneous." *Mesecher v. Cropp,* 213 Kan. 695, 702, 518 P.2d 504 (1974); K.S.A. 60-251(*b*). "An instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict." *State v. Stafford,* 223 Kan. 62, 65, 573 P.2d 970 (1977). Although plaintiff complains that this instruction sets up a different standard than that required by the Uniform Commercial Code, the wording itself does not appear to do so, insofar as it is clearly stated that custom alone does not determine whether reasonable care was used. Even if the instruction could be so interpreted, K.S.A. 84-4-103(3) states that "action or nonaction consistent with clearinghouse rules and the like or with a general banking usage not disapproved by this article, prima facie constitutes the exercise of ordinary care." At the very least, this section allows custom to be given some weight, and the trial court's instruction could have gone further than it did and yet still have stated the law.

Apart from arguing that the instruction was confusing, plaintiff has not shown that the instruction incorrectly stated the law, and any confusion would appear to have been taken care of through the cautionary wording in the instruction that the bank custom in and of itself does not establish a standard of reasonable care. Plaintiff has not met her burden of showing that the instruction was clearly erroneous.

Plaintiff next argues that, with regard to the checking account, the verdict rendered by the jury was not supported by the evidence in that there was ample uncontroverted evidence that the signatures were unauthorized, that the bank did not use due care in detecting them, and that plaintiff was not responsible for the losses by any failure on her part to detect the unauthorized signatures. As will be seen when we discuss the applicable scope of review, it is irrelevant whether evidence favorable to plaintiff exists, for it is the evidence in favor of the bank which is the key. For our scope of review is limited as follows:

"A jury, of course, may believe or disbelieve evidence and give to.it varying degrees of weight. This court cannot nullify a jury's disbelief of evidence nor can it invade the jury's province of determining the persuasiveness of testimony which it may have believed. [Citations omitted.] Particularly when a jury verdict is involved we have said many times that upon appeal in considering the propriety of a verdict the evidence is to be reviewed in a light most favorable to sustaining the verdict." *Tatro v. Lueken,* 212 Kan. 606, 618, 512 P.2d 529 (1973).

Nor can this court nullify a jury's belief or disbelief of evidence or determine the persuasiveness of evidence which the jury may have believed. *American Housing & Investment Co. v. Stanley Furniture Co.,* 202 Kan. 344, 449 P.2d 561 (1969). And, where a case involves negative findings, as here, they will not be disturbed in the absence of an arbitrary and capricious disregard of undisputed evidence or some extrinsic consideration such as a biased or prejudiced jury. *Schroeder v. Richardson,* 196 Kan. 363, 411 P.2d 670 (1966).

The verdict was a general verdict and thus we cannot know exactly why the jury found for the defendant. Sufficient competent evidence exists to support a number of legally sufficient reasons. Grossly simplified and condensed, the applicable portions of the U.C.C. provide that if the drawer's signature is unauthorized (which includes forgery per K.S.A. 84-1-201[43]), the signature is "inoperative" under K.S.A. 84-3-404(1). The

plaintiff had the burden of proving the signature was unauthorized. If she sustained that burden, she can recover the funds wrongfully paid out *unless* her own negligence substantially contributed to the unauthorized signature (K.S.A. 84-3-406), or unless she failed to exercise reasonable care and promptness in examining her bank statements and checks so as to discover unauthorized signatures and promptly notify the bank (K.S.A. 84-4-406[1]). The defendant bank has the burden of establishing plaintiff's negligence in failing to discover and report the unauthorized signatures, and if the bank meets its burden and further proves it suffered a loss, then the plaintiff may not assert against the bank the unauthorized signatures she negligently failed to discover and report (K.S.A. 84-4-406[2][a]); nor may the plaintiff recover upon any instruments bearing unauthorized signatures by the same wrongdoer which the bank paid in good faith after the bank statement and checks were made available to the plaintiff for a reasonable period (not to exceed fourteen days) until the plaintiff gives the bank notification of the unauthorized signature (K.S.A. 84-4-406[2][b]). While the bank has the burden of proving plaintiff's negligence, the preclusions under section (2) of 84-4-406 do not apply if the plaintiff establishes lack of ordinary care on the part of the bank in paying the checks. K.S.A. 84-4-406(3). What constitutes negligence is a question of fact. For general discussions, see 5 Hart and Willier, Forms and Procedures under U.C.C. (1968), Bank Deposits and Collections § 42.10 (1968); Clark and Squillante, The Law of Bank Deposits, Collections and Credit Cards, ch. VI: Allocation of Fraud Losses (1970); Bailey, Brady on Bank Checks, ch. 15: Forged Checks and Forged Indorsements (1979 Supp. No. 1); Vernon's Kansas Statutes Annotated, Uniform Commercial Code § 84-4-406: Customer's Duty to Discover and Report Unauthorized Signature or Alteration (1968).

Here, the jury may have disbelieved that the check signatures were unauthorized. There was testimony that the signatures were very much like plaintiff's, which was apparently so much the case that plaintiff herself testified that by looking at the signatures alone she could not tell the difference on many of them. Her testimony was inconsistent, for while she testified she knew several of the checks were forged because she never wrote and signed checks to her husband, she was shown at least one check

where she had admittedly done so. She testified she took great care of her checkbook, yet many of the checks which she testified contained her unauthorized signature were in sequence with checks she admitted signing..Her admitted signatures varied from check to check and over a period of time. In addition, three of the checks were payable to plaintiff's landlord and many others were written for what appeared to be normal living expenses. Although there was no direct evidence that the signatures were plaintiff's, the jury was not obligated to believe her testimony. *Smith v. Lockridge,* 145 Kan. 395, 398, 65 P.2d 345 (1937). All of defendant's witnesses testified they would have paid the checks had they been examining the signatures, thus at least indirectly giving their opinion that the checks were not forged. The jury may have disbelieved plaintiff's testimony and found that she did not sustain her burden of proving an unauthorized signature.

Ample evidence exists from which the jury could have concluded the plaintiff was negligent in examining her bank statements and checks for unauthorized signatures. The bank offered evidence that the bank statements and cancelled checks were mailed to plaintiff in the regular course of banking business on a quarterly basis. While the plaintiff denied having received them during all of 1972, she was aware the statements and cancelled checks were received on a quarterly basis and admitted receiving them for over six years previous to 1972. She denied making any effort to obtain her cancelled checks or to report to the bank that she had not received them. However, two bank employees testified she told them she had received the statements and cancelled checks and noticed a discrepancy, but had not reported the irregularities to the bank as she thought the bank would straighten things out. Consistent with the bank employees' testimony is the introduction by plaintiff of cancelled checks which she testified bore unauthorized signatures, and which the jury could have logically inferred came into the possession of the plaintiff along with the bank statements which plaintiff denied having received. A depositor's negligence in failing to notify a bank or make inquiry concerning the nonreceipt of a bank statement and cancelled checks has in itself been held to be negligence substantially contributing to an unauthorized signature. *Myrick v. National Savings & Trust Company,* 268 A.2d 526 (D.C. 1970).

Plaintiff further testified she kept only a limited check register. Had she kept track of her checks, she would have noted checks missing from the sequence of those she admitted having written. Assuming the jury believed the signatures were unauthorized, it could have concluded plaintiff negligently failed to discover and report the unauthorized signatures. There is sufficient competent evidence from which the jury could have determined that the bank used ordinary care in paying the checks. The jury's verdict as to the checking account is supported by substantial competent evidence and the trial court did not abuse its discretion in denying plaintiff's motion for judgment n.o.v.

Plaintiff next argues that the jury's verdict as to the savings account was unsupported by the evidence. The scope of review is the same as for the checking account. An "account" in article 4 of the Kansas U.C.C. includes a savings account with a bank (K.S.A. 84-4-104[a]; see also Kansas Code Comment under Vernon's Kansas Statutes Annotated, Uniform Commercial Code § 84-4-104 [1968]), hence most of the analysis from that portion of this opinion concerning the checking account also applies here.

As the plaintiff received no savings account statements from the bank during the critical period, if the verdict is to be affirmed it must be on the basis that the jury did not believe *plaintiff's* testimony that the signatures were unauthorized, or that plaintiff's negligence in failing to examine her cancelled checks and *checking* account statements and to promptly report any unauthorized signatures to the bank precludes her from asserting the alleged unauthorized signatures on *savings* account withdrawals at the same bank.

The parties have not provided us, nor does our research reveal, any cases we deem to be in point. The first savings account withdrawal which plaintiff challenges occurred on April 10, 1972, more than fourteen days after she normally would have received her quarterly checking account statement and cancelled checks. As noted earlier, the plaintiff had a duty to exercise reasonable care and promptness in examining the statements and cancelled checks to discover unauthorized signatures and to promptly notify the bank if any were discovered. Plaintiff did not do so, and her failure precluded her from asserting any unauthorized signatures by the same wrongdoer *"on any other item* paid in good faith by the bank after the first item and statement was

available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature." K.S.A. 84-4-406(2)(*b*); emphasis added. Plaintiff alleged all the unauthorized signatures concerning the checks and savings account were made by her then-husband, Isaiah Coleman. "Item" is defined in K.S.A. 84-4-104(*g*) as "any instrument for the payment of money even though it is not negotiable but does not include money." Webster's Third New International Dictionary at page 1172 (Unabridged 1976) defines an instrument as "a legal document . . . evidencing legal rights or duties especially of one party to another," while Black's Law Dictionary at page 941 (4th ed. rev. 1968) defines instrument as:

> "A written document; a formal or legal document in writing, such as a contract, deed, will, bond, or lease. State v. Phillips, 157 Ind. 481, 62 N.E. 12; Cardenas v. Miller, 108 Cal. 250, 39 P. 783, 49 Am.St.Rep. 84.
>
> "Anything reduced to writing, a document of a formal or solemn character, a writing given as a means of affording evidence. Smith v. Smith, Ind. App., 110 N.E. 1013, 1014. A document or writing which gives formal expression to a legal act or agreement, for the purpose of creating, securing, modifying, or terminating a right; a writing executed and delivered as the evidence of an act or agreement. Moore v. Diamond Dry Goods Co., 47 Ariz. 128, 54 P.2d 553, 554."

An examination of the savings account withdrawal order convinces us it is both an instrument and an item. The signature of the drawer was required on the savings account withdrawal order before money would be paid from the account by the bank.

The question then comes down to whether the legislature intended to limit the defense extended to a bank in K.S.A. 84-4-406(2)(*b*) to "any other item paid in good faith by the bank" to subsequent payments from the same account, or intended it to apply to "any other item" paid by the bank out of any account of the same drawer in that bank whether it be a different checking account or a savings account.

The interpretation of a statute is a question of law and it is the function of the court to interpret a statute to give it the effect intended by the legislature when that intent can be ascertained from the statute. *State, ex rel., v. Unified School District,* 218 Kan. 47, 542 P.2d 664 (1975). Construction of the statute should be based on legislative intent to be determined from the whole act, and construction should be in accord with the general intent and purpose of the entire statute if it is reasonably possible to do so. *In re Birdsong,* 216 Kan. 297, 532 P.2d 1301 (1975).

In determining legislative intent, courts are not limited to a mere consideration of the language employed, but may properly look to the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished, and the effect the statute may have under various constructions suggested. *Southeast Kansas Landowners Ass'n v. Kansas Turnpike Auth.,* 224 Kan. 357, 367, 582 P.2d 1123 (1978); *State v. Luginbill,* 223 Kan. 15, Syl. ¶ 2, 574 P.2d 140 (1977).

We presume that when the legislature adopted sections of the official U.C.C. without change it intended to give the same construction that was intended by the drafters. Under the official U.C.C. comment we find the following:

"This rule follows substantial case law that payment of an additional item or items bearing an unauthorized signature or alteration by the same wrongdoer is a loss suffered by the bank traceable to the customer's failure to exercise reasonable care in examining his statement and notifying the bank of objections to it. One of the most serious consequences of failure of the customer to comply with the requirements of subsection (1) is the opportunity presented to the wrongdoer to repeat his misdeeds. Conversely, one of the best ways to keep down losses in this type of situation is for the customer to promptly examine his statement and notify the bank of an unauthorized signature or alteration so that the bank will be alerted to stop paying further items." K.S.A. 84-4-406, Official U.C.C. Comment 3.

The objective of the statute is thus to impose a duty on the bank customer to report unauthorized signatures so that the bank is alerted to problems and, being so forewarned, placed in a better position to protect itself. We are of the opinion that the legislature intended 84-4-406(2)(*b*) to apply to any item paid by the bank in good faith on an unauthorized signature, even though payment is made from an account different from the one in which the bank customer was negligent in failing to report an unauthorized signature. Here evidence was presented that the savings account would have been protected by the bank had the bank been alerted by plaintiff to the checks she claimed bore her unauthorized signature. Thus there is sufficient competent evidence to support the jury's verdict, either because the jury found negligence or because it may have disbelieved plaintiff and found she did not sustain her burden of proof.

Plaintiff also alleges the defendant was guilty of negligence as a matter of law and thus plaintiff is not precluded from setting up defenses under K.S.A. 84-4-406(3). Certainly there is ample evi-

dence from which the jury could have so found. However, whether the bank was negligent is a question of fact, and reasonable minds could have differed on this point. The trial court properly submitted the matter to the jury, and there is sufficient competent evidence to support the jury's verdict when the evidence is viewed in a light most favorable to defendant.

Affirmed.