**RHODE ISLAND HOSPITAL TRUST NATIONAL BANK,**
**Plaintiff, Appellee,**

**v.**

**ZAPATA CORPORATION, et al.,**
**Defendants, Appellees.**

**Zapata Gulf Crews, Inc.,**
**Defendant, Appellant.**

**No. 87–1890.**

United States Court of Appeals,
First Circuit.

Heard Feb. 4, 1988.

Decided June 1, 1988.

James T. Murphy, with whom Matthew T. Oliverio and Hanson, Curran & Parks, Providence, R.I., were on brief, for defendant, appellant.

Barbara S. Cohen, with whom Anthony F. Muri and Licht & Semonoff, Providence, R.I., were on brief, for plaintiff, appellee Rhode Island Hosp. Trust Nat. Bank.

Before COFFIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

The issue that this appeal presents is whether Zapata Corporation has shown that the system used by Rhode Island Hospital Trust National Bank for detecting forged checks—a system used by a majority of American banks—lacks the "ordinary care" that a bank must exercise under the Uniform Commercial Code § 4–406(3) (1977), embodied here in Rhode Island General Laws, § 6A–4–406(3) (1985). The question arises out of the following district court determinations, all of which are adequately supported by the record and by Rhode Island law.

1. In early 1985, a Zapata employee stole some blank checks from Zapata. She wrote a large number of forged checks, almost all in amounts of $150 to $800 each, on Zapata's accounts at Rhode Island Hospital Trust National Bank. The Bank, from March through July 1985, received and paid them.

2. Bank statements that the Bank regularly sent Zapata first began to reflect the forged checks in early April 1985. Zapata failed to examine its statements closely until July 1985, when it found the forgeries. It immediately notified the Bank, which then stopped clearing the checks. The Bank had already processed and paid forged checks totaling $109,247.16.

3. The Bank will (and legally must) reimburse Zapata in respect to all checks it cleared before April 25, 1985 (or for at least two weeks after Zapata received the statement that reflected the forgeries). *See* U.C.C. §§ 3–401(1), 4–406(2) (1977).

4. In respect to checks cleared on and after April 25, the Bank need not reimburse Zapata because Zapata failed to "exercise reasonable care and promptness to examine the [bank] statement." U.C.C. § 4–406(1) (1977).

The question before us is whether this last-mentioned conclusion is correct or whether Zapata can recover for the post-April 24 checks on the theory that, even if it was negligent, so was the Bank.

To understand the question, one must examine U.C.C. § 4–406, R.I.Gen.Laws § 6A–4–406. Ordinarily a bank must reimburse an innocent customer for forgeries that it honors, § 6A–3–401(1) (1985), but § 6A–4–406 makes an important exception to the liability rule. The exception operates in respect to a series of forged checks, and it applies once a customer has had a chance to catch the forgeries by examining his bank statements and notifying the bank but has failed to do so.

The statute, in relevant part, reads as follows:

(1) *When a bank sends to its customer a statement of account* accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, *the customer must exercise reasonable care and promptness to examine the statement* and items *to discover his unauthorized signature* or any alteration on an item *and must notify the bank promptly* after discovery thereof.

(2) *If the bank establishes that the customer failed* with respect to an item *to comply with* the duties imposed on the

customer by *subsection (1) the customer is precluded from asserting against the bank*

(a) *His unauthorized signature* or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; *and*

(b) *An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the* first item *and statement was available to the customer for a reasonable period not exceeding fourteen (14) calendar days* and before the bank receives notification from the customer of any such unauthorized signature or alteration.

§ 6A–4–406(1)–(2) (emphasis added).

The statute goes on to specify an important exception to the exception. It says:

(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

§ 6A–4–406(3). Zapata's specific claim, on this appeal, is that it falls within this "exception to the exception"—that the bank's treatment of the post-April 24 checks lacked "ordinary care."

■ Zapata says as a preliminary matter, that the district court failed to make a finding on this "ordinary care" question. We do not think that is so. The court, while considering a different, but related, issue, found that the bank's practices met "reasonable commercial standards." The word "reasonable" implies that use of those standards was not by itself negligent or lacking in ordinary care. *See Vending Chattanooga, Inc. v. American National Bank and Trust Co.,* 730 S.W.2d 624, 628 (Tenn.Sup.Ct.1987) (equating "ordinary care" with compliance with "reasonable commercial standards" of banking industry); *Medford Irrigation District v. Western Bank,* 66 Or.App. 589, 592–94, 676 P.2d 329, 332 (1984) (similar); *see also Perley v. Glastonbury Bank and Trust Co.,* 170 Conn. 691, 699, 368 A.2d 149, 153 (1976) (approving equation of "reasonable care" required by § 3–406 with care of "ordinarily prudent person under the circumstanc-

es"); *Fidelity and Casualty Co. of New York v. Constitution National Bank,* 167 Conn. 478, 483, 356 A.2d 117, 121 (1975) (similar); *Coleman v. Brotherhood State Bank,* 3 Kan.App.2d 162, 166–67, 592 P.2d 103, 109 (1979) (approving instruction giving weight to "banking customs" in formulation of standard for "reasonable care" or "ordinary care"); *Transamerica Insurance Co. v. United States National Bank,* 276 Or. 945, 952–54, 558 P.2d 328, 333–34 (1976) (equating "reasonable care," "reasonable banking standards," and "ordinary care" in state version of U.C.C. § 3–406 and § 4–406).

Whether or not the district court made an explicit finding, however, we should, and do, affirm the district court's judgment in the bank's favor. Our examination of the statute reveals that the statute places the burden of proof on Zapata. Our examination of the record reveals that Zapata failed to shoulder that burden; and, given the record, no reasonable person could find the contrary.

■ a. The statute places the burden of proof on Zapata. It says that strict bank liability terminates fourteen days after the customer receives the bank's statement unless *the customer establishes* lack of ordinary care." § 6A–4–406(3) (emphasis added); *see, e.g., Vending Chattanooga,* 730 S.W.2d at 628. And, the U.C.C. commentary makes clear that the statute means what it says. The commentators explain the purpose of the statutory section as follows:

One of the most serious consequences of failure of the customer ... [to examine his statement and notify the bank promptly of an unauthorized signature] ... is the opportunity presented to the wrongdoer to repeat his misdeeds. Conversely, one of the best ways to keep down losses in this type of situation is for the customer to promptly examine his statement and notify the bank ... so that the bank will be alerted to stop paying further items.

U.C.C. § 4–406 comment 3. The Commentary goes on to say:

[E]ven if the bank succeeds in establishing that the customer has failed to exer-

cise ordinary care, if in turn the customer succeeds in establishing that the bank failed to exercise ordinary care in paying the items[,] the preclusion rule does not apply. *This distribution of the burden of establishing between the customer and the bank provides reasonable equality of treatment and requires each person asserting the negligence to establish such negligence rather than requiring either person to establish that his entire course of conduct constituted ordinary care.*

*Id.* comment 4 (emphasis added).

■ b. The record convinces us that Zapata failed to carry its burden of establishing "lack of ordinary care" on the part of the Bank. First, the Bank described its ordinary practices as follows: The Bank examines all signatures on checks for more than $1,000. It examines signatures on checks between $100 and $1,000 (those at issue here) if it has reason to suspect a problem, *e.g.*, if a customer has warned it of a possible forgery or if the check was drawn on an account with insufficient funds. It examines the signatures of a randomly chosen one percent of all other checks between $100 and $1,000. But, it does not examine the signatures on other checks between $100 and $1,000. Through expert testimony, the Bank also established that most other banks in the nation follow this practice and that banking industry experts recommend it. Indeed, Trust National Bank's practices are conservative in this regard, as most banks set $2500 or more, not $1,000, as the limit beneath which they will not examine each signature.

This testimony made out a *prima facie* case of "ordinary care." U.C.C. § 4–103(3) (1977); R.I.Gen.Laws § 6A–4–103(3) (1985) ("[a]ction or nonaction ... consistent with ... a general banking usage not disapproved by this [Article or] chapter, prima facie constitutes the exercise of ordinary care"); *see Vending Chattanooga*, 730 S.W.2d at 628–29 (§ 4–103(3) indicates that "ordinary care" exercised if practice accords with "reasonable commercial standards"); *Coleman*, 3 Kan.App.2d at 166–67, 592 P.2d at 109. Of course, Zapata

might still try to show that the entire industry's practice is unreasonable, that it reflects lack of "ordinary care." *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932). In doing so, however, "the *prima facie* rule does ... impose on the party contesting the standards to establish that they are *unreasonable, arbitrary,* or *unfair.*" U.C.C. § 4–103 comment 4 (emphasis added).

Second, both bank officials and industry experts pointed out that this industry practice, in general and in the particular case of the Trust National Bank, saved considerable expense, compared with the Bank's pre–1981 practice of examining each check by hand. To be specific, the change saved the Bank about $125,000 annually. Zapata accepts this testimony as accurate.

Third, both a Bank official and an industry expert testified that changing from an "individual signature examination" system to the new "bulk-filing" system led to *no* significant increase in the number of forgeries that went undetected. Philip Schlernitzauer, a Bank vice-president and the officer in charge of the Zapata account, testified that under the prior "individual signature examination" system, some forgeries still slipped through. The Bank's loss was about $10,000 to $15,000 per year. He also determined through a feasibility study that by implementing a "bulk-filing" system in which 99 percent of checks under $1,000 were not individually screened, the loss would remain between $10,000 and $15,000. Dr. Lipis, an executive vice-president of a large consulting firm to the financial industry, testified that among its purposes was the following:

Well, it improves the ability to return checks back to customers more correctly, simply that the checks do not get misplaced when they are handled; generally [it] can improve the morale within th[e] bank because ... the signature verification is very tedious, very difficult, and not a function that is liked by anybody who does it. In addition, *it does not*

*impact the amount of forgeries that are produced at the bank.*

Rec.App. 179 (emphasis added).

Zapata points to *no* testimony or other evidence tending to contradict these assertions. An industry-wide practice that saves money without significantly increasing the number of forged checks that the banks erroneously pay is a practice that reflects at least "ordinary care." *Cf. Vending Chattanooga*, 730 F.2d at 628–29 (weighing economic feasibility and business practice into definition of "ordinary care" or "reasonable commercial standards").

Fourth, even if one assumes, contrary to this uncontradicted evidence, that the new system meant *some* increase in the number of undetected forged checks, Zapata still could not prevail, for it presented *no* evidence tending to show any such increased loss unreasonable in light of the costs that the new practice would save. Instead, it relied simply upon the assertion that costs saved the bank are irrelevant. But, that is not so, for what is reasonable or unreasonable insofar as "ordinary care" or "due care" or "negligence" (and the like) are concerned is often a matter of costs of prevention compared with correlative risks of loss. *See Vending Chattanooga*, 730 F.2d at 628–29; *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947) (Hand, J.) ("duty" defined by calculating probability of injury times gravity of harm to determine "burden of precaution" that is warranted). One does not, for example, coat the base of the Grand Canyon with soft plastic nets to catch those who might fall in, or build cars like armored tanks to reduce injuries in accidents even though the technology exists. *Compare Maine Yankee Atomic Power Co. v. National Labor Relations Board*, 624 F.2d 347, 349 (1st Cir.1980) (under *Carroll Towing* calculus, gravity of accident at nuclear reactor merits exercise of "extraordinary vigilance" by employees) *with Commonwealth of Massachusetts v. Andrus*, 594 F.2d 872, 892 (1st Cir.1979) (under *Carroll Towing* calculus, Secretary of Interior should assure that life systems of oceans not "unreasonably jeopardized" by oil and gas extraction activities). In arguing that the Bank provided "no care" in respect to the checks it did not examine, Zapata simply assumed the very conclusion (namely, the unreasonableness of a selective examination *system*) that it sought to prove. Aside from this assumption, its evidentiary cupboard is bare. *Cf. Ind–Com Electric Co. v. First Union National Bank*, 58 N.C.App. 215, 217, 293 S.E.2d 215, 216–17 (1982) (granting summary judgment for defendant bank where no specific evidence adduced by plaintiff).

As Zapata contends, there are several cases that hold or imply that "ordinary care" necessarily implies individualized scrutiny of every check. But, several of those cases are old, decided in different technological circumstances and before the U.C.C. *See, e.g., Frankini v. Bank of America National Trust And Savings Association*, 31 Cal.App.2d 666, 671, 88 P.2d 790, 793 (1939) (teller has duty to "acquaint himself with the signature of the customer"); *Herbel v. Peoples State Bank of Ellinwood*, 170 Kan. 620, 228 P.2d 929 (1951); *see also Leather Manufacturers' Bank v. Morgan*, 117 U.S. 96, 112–13, 114, 6 S.Ct. 657, 663, 664, 29 L.Ed. 811 (1886) (dictum). The U.C.C. intends technological change to make a difference, a fact which its *prima facie* equation of "ordinary care" and "general banking usage" implies, *see* § 4–103(3), and which its commentators made explicit. *See* U.C.C. § 4–103 comment 1 ("[i]n view of the technical complexity of the field of bank collections, the enormous number of items handled by banks, ... and the possibility of developing improved methods of collection to speed the process, it would be unwise to freeze present methods of operation by mandatory statutory rules"); *see also Vending Chattanooga*, 730 S.W.2d at 628 ("ordinary care" cannot "require the bank to hire such a large number of skilled handwriting experts so as to be economically not feasible, ... [not] commercially reasonable").

We have found a few, more modern cases that arguably support Zapata's view, but they involve practices more obviously unreasonable than those presented here. *See, e.g., Hanover Insurance Cos. v.*

*Brotherhood State Bank,* 482 F.Supp. 501 (D.Kan.1979) (no ordinary care where *no* examination of *any size* checks, conspicuous forgeries); *Perley,* 170 Conn. at 702–03, 368 A.2d at 155 (no ordinary care where *no* authentication of endorsements of *any size* checks); *Indiana National Corp. v. Faco, Inc.,* 400 N.E.2d 202 (Ind.App.1980) (checks *without signatures* paid, 30 check copies lost); *Medford Irrigation District, supra* (same where *no* examination of any checks under $5,000). And, in any event, we believe Rhode Island would follow the more significant body of modern case law suggesting analysis along the lines we have undertaken. *See Industrial Systems of Huntsville, Inc. v. American National Bank of Huntsville, N.A.,* 376 So.2d 742, 743 (Ala.Civ.App.1979) (general banking practice used as guideline in case where individualized checking performed); *Coleman,* 3 Kan.App.2d at 166–67, 592 P.2d at 109–10 (same); *Read v. South Carolina National Bank,* 286 S.C. 534, 540–41, 335 S.E.2d 359, 362–63 (1985) (same); *Vending Chattanooga,* 730 S.W.2d at 628 ("ordinary care" is action in accordance with "reasonable commercial standards of the banking industry"); *see also First Federal Savings and Loan Association of Hamilton v. Alabama National Bank of Montgomery,* 372 So.2d 350, 352 (Ala.Civ.App.1979) (similar, concerning U.C.C. § 3–406); *cf. Ind–Com Electric Co., supra; Silvia v. Industrial National Bank of Rhode Island,* 121 R.I. 810, 814, 403 A.2d 1075, 1077 (1979) (identifying *"underlying purpose"* of § 4–406 to be "to encourage customers to discover and report promptly ... irregularities in checks and at same time to promote finality of transactions") (emphasis added).

For these reasons, the judgment of the district court is

*Affirmed.*