The GUARDIAN LIFE INSURANCE COMPANY OF AMERICA; The Guardian Insurance & Annuity Company, Inc.

v.

Mark WEISMAN; Chemical Bank of Delaware; Midlantic National Bank; Corestates Bank of Delaware, N.A.; Merchants Bank, N.A.; ABC Bank; John Does 1–10

v.

PNC Bank, N.A.; The Guardian Insurance & Annuity Company, Inc; Mark Weisman; Chemical Bank of Delaware; Midlantic National Bank, Third–Party Plaintiffs,

v.

Weisman Associates; ABC Companies 1–10; John Does 1–10; Jane Does 1–10, Third–Party Defendants.

---

230

The New England Mutual Life
Insurance Company

v.

Midlantic National Bank, N.A.; Wacho-
via Bank Of Georgia; John Doe Bank,
1–10; John Doe, individuals 1–10;

v.

PNC Bank, N.A.; Wachovia Bank of
Georgia, Third–Party Plaintiffs,

v.

Mark Weisman; Weisman Associates;
ABC Companies 1–10; John Does 1–
10; Jane Does 1–10, Third–Party De-
fendants;

Chemical Bank of Delaware; Cores-
tates Bank of Delaware, N.A.,
Appellants,

The Guardian Life Insurance Company
of America; The Guardian Insurance
& Annuity Company, Inc.; The New
England Mutual Life Insurance Com-
pany, Appellants.

Nos. 99–5397, 99–5398.

United States Court of Appeals,
Third Circuit.

Argued May 30, 2000.

Filed Aug. 14, 2000.

Gregg S. Sodini (Argued), Harris, Beach & Wilcox, Hackensack, NJ, for Appellants/Cross Appellees.

Dennis J. Drasco (Argued), Kevin J. O'Connor, Lum, Danzis, Drasco, Positan & Kleinberg, Roseland, NJ, for Appellees/Cross Appellants.

Before SCIRICA, NYGAARD and COWEN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge

Over the course of roughly five years Mark Weisman, an authorized agent of three insurance companies, submitted fraudulent payment requests to those companies using various customers' names. With the payments routed through his office, Weisman ultimately collected 91 checks, which he promptly deposited into his personal bank account after forging the payee indorsements. Because Weisman is now in prison and insolvent, we must interpret several provisions of the Uniform Commercial Code affecting who will bear the loss in the absence of his ability to pay.

The first question we must resolve is whether a drawee bank must verify illegible payee indorsements on checks received from a depositary bank before the drawee bank is entitled to assert the negligent drawer defense under § 3–406, as adopted by Delaware prior to July 1, 1995. The District Court concluded that because the banks maintaining the insurers' accounts did not conduct such a review, they failed to comply with reasonable commercial standards and therefore are precluded from asserting the drawer's negligence as a defense under § 3–406. We reverse the District Court's order and hold that as a matter of law drawee banks are not obliged to review payee indorsements on checks received from depositary banks.

Second, having determined that the drawee banks were not required to review the payee indorsements, we must consider the insurers' fall-back argument: they maintain that under § 3–406 a drawee bank must prove that both it as well as the depositary bank acted within reasonable commercial standards. We are persuaded, however, that the bank's position is better supported and that only the drawee bank's conduct is relevant when that bank is asserting the defense.

Third, applying New Jersey law, we must determine whether a drawer can maintain an action against a depositary bank for conversion or negligence. We agree with the District Court that a drawer cannot. Given these holdings, we will remand to the District Court for factfinding to determine whether the insurers were negligent and whether that negligence substantially contributed to the forgeries within the meaning of § 3–406.

I

Although Weisman deposited 91 checks, most of them are not at issue in this appeal and were evaluated by the District Court under other provisions in the U.C.C., such as § 3–405, concerning forgeries committed by a drawer's employee, and § 4–406, dealing with a drawer's duty to discover and report forgeries. The District Court's analysis of those provisions is not before us.

Instead we must analyze the effect of § 3–406 on a subset of the checks drawn on accounts that two of the insurers, The Guardian Life Insurance Company of America and The Guardian Insurance and Annuity Company, Inc., held at Chemical Bank of Delaware and Corestates Bank of Delaware. This subset of checks resulted in liability of $44,587 .02 for Chemical and $239,791.28 for Corestates.

The parties agree that the checks at issue under § 3–406 are governed by Delaware law and that we must apply the former version of the provision, as the 1990 revisions to Article 3 of the U.C.C. did not take effect in Delaware until July 1, 1995. (For convenience, we cite throughout only to the U.C.C.'s numbering rather than using Delaware's full statutory citation, such as 6 Del.C. § 3–406.) Because the parties do not direct us to any precedential Delaware case interpreting § 3–406, and we have found none, we rely on the language of the U.C.C., its official comments, and other jurisdictions' interpretations of the Code. *See, e.g.,*

*Jackson v. Multi–Purpose Criminal Justice Facility*, 700 A.2d 1203, 1205 (Del. 1997) (applying plain language of statute); *Acierno v. Worthy Bros. Pipeline Corp.*, 656 A.2d 1085, 1090 (Del.1995) ("An official comment [to the U.C.C.] written by the drafters of a statute and available to a legislature before the statute is enacted has considerable weight as an aid to statutory construction."); *Friendly Finance Corp. v. Bovee*, 702 A.2d 1225 (Del.1997) (relying on decisions from other states to interpret U.C.C. provisions). *Cf. Menichini v. Grant*, 995 F.2d 1224, 1229 (3d Cir. 1993) (noting that under Pennsylvania law decisions from other jurisdictions are " 'entitled to even greater deference where consistency and uniformity of application are essential elements of a comprehensive statutory scheme like ... the Uniform Commercial Code.' " (citation omitted)).

We begin with a brief overview of the negligent drawer defense. The applicable pre–1990 version of § 3–406 states,

> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

To appreciate how this provision functions, it is important to remember that ordinarily a forged check is not properly payable within the meaning of § 4–401(1) of the U.C.C., and therefore a drawee bank must credit its drawer's account for a forged check that the drawee paid. *See, e.g., In re Lou Levy & Sons Fashions, Inc.*, 988 F.2d 311, 314 (2d Cir.1993). Section 3–406 creates an exception to this general rule: if the drawer was negligent and that negligence substantially contributed to the forgery, then the drawee bank can refuse to credit the drawer's account for a forgery that the bank paid. *Id.* In

this appeal we are primarily concerned with an exception that § 3–406 creates to the exception making the drawer liable. Namely, under the pre–1990 version of the U.C.C., if a drawee bank fails to act in good faith and in accordance with reasonable commercial standards in paying a forged check, then the drawee bank will remain liable for the forgery even though the drawer acted negligently and that negligence substantially contributed to the forgery. *See, e.g.,* § 3–406 comment 6 ("Thus any bank which takes or pays an altered check which ordinary banking standards would require it to refuse cannot take advantage of the estoppel.").

As an aside, we note that under the changes introduced in the 1990 revision to U.C.C. § 3–406, which became effective in Delaware in 1995, a comparative rather than contributory negligence scheme is used, so each party bears the loss in proportion to its contribution. When both the bank and the drawer committed acts triggering their respective negligence standards, the revised version states that "the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss." § 3–406(b). *See generally* 2 James J. White & Robert S. Summers, Uniform Commercial Code 246 (4th ed. 1995) ("Under the old Code, proof that the bank was negligent generally meant that the entire loss fell on the bank, not the depositor, regardless of the depositor's negligence. Now, [under the revised Code] the depositor will seldom be able to cast the entire loss on the bank; the loss will be shared.").

The District Court concluded that the drawee banks did not act in accordance with reasonable commercial standard—placing them within the exception to the exception-because those banks did not review whether the payee indorsements were legible and matched the named payee on checks received from a depositary bank. The theory of the District Court's opinion

was that, while a drawee bank typically will not be in a position to verify by itself legible payee indorsements (for the drawee bank very likely will not maintain any accounts with the payee and would not have the payee's signature on hand), the drawee bank nevertheless should be alerted that there potentially could be a problem if a payee indorsement is illegible or is not in the name of the named payee.

We believe this rule is mistaken for at least two reasons. First, when a drawee bank receives a check from a depositary bank, the drawee bank receives certain presentment warranties from the depositary bank guaranteeing payment. *See, e.g.*, U.C.C. §§ 4–207 and 3–417. Given these warranties, there is little reason for the drawee bank to inquire into the validity of payee indorsements, and indeed courts have gone so far as to hold, citing these warranties, that a drawee bank was liable for refusing to accept from a depositary bank a check that completely lacked a payee indorsement. *See Dienco, Inc. v. Security Nat. Bank*, 221 N.J.Super. 438, 534 A.2d 1035 (N.J.Super.App.Div.1987). It would hardly make sense to declare that a drawee bank failed to adhere to reasonable commercial practices by routinely accepting checks with illegible indorsements, while at the same time holding that the bank would be liable for refusing such checks.

Second, we think it is reasonable that what review there is of payee indorsements should take place at the depositary bank, which is most likely to have the information available to verify a depositor's indorsement. One leading treatise has similarly reasoned: "It is foolhardy to ask collecting banks who are not depositary banks to do any more than pass on instruments in an utterly mechanical way without consideration of anything other than the MICR line. Depositary banks, on the other hand, are in the best position to prevent certain kinds of fraud, particularly those involving indorsements." 1 James J. White & Robert S. Summers, Uniform Commercial Code 808 (3d ed.1988).

To appreciate why it would be a mistake to require drawee banks to review payee indorsements, it is important to think through what would happen if the payee indorsement is not legible. Since many people do not have a legible signature, the drawee bank cannot simply assume the check is a forgery. Instead, the bank would have to make some further investigation, presumably by contacting the depositary bank. And this brings us to the question of what review depositary banks must conduct of payee indorsements (or similarly what review drawee banks must conduct for drawer signatures).

The procedures banks use for verifying signatures on checks have evolved considerably over the past half-century, a process that has only accelerated in the past two decades. As the size of our economy has expanded, the volume of checks handled daily by banks is, as White and Summers have noted, in the millions. In light of this massive quantity of checks, as well as the demand for lower transaction costs, it is now common that when a check is deposited, there is often no verification of signatures or at most random sampling for checks below a certain amount. "To accommodate the explosive growth of checks, banks have automated almost all of the payment process. Except for random examination, most banks look at signatures only on checks above a fixed dollar amount. In truncation systems, the payor bank never receives the depositor's checks and, a fortiori, never sees the signature on the original check." 2 James J. White & Robert S. Summers, 363 Uniform Commercial Code (4th ed.1995).

In *Rhode Island Hosp. Trust Nat'l Bank v. Zapata Corp.*, 848 F.2d 291 (1st Cir.1988) (Breyer, J.) the court held that a bank had exercised "ordinary care" when the bank's only means for detecting forgeries in checks below a certain value was randomly to select a group for verification. The court explained that the system was

"used by the majority of American banks," *id.* at 294, and noted that the procedure "led to *no* significant increase in the number of forgeries that went undetected," while a system where each check was examined imposed very considerable expenses. *Id.* Reasonable care, as then-Judge Breyer pointed out, has long been evaluated in terms of a very conventional piece of economics: the cost of a risk-averting procedure should not exceed its expected benefit, where the measure's expected benefit in this context is calculated by multiplying the harm sought to be averted by the amount the measure reduces the likelihood of the harm occurring. *Id.* at 295 (*citing United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.)). Just as one does not spend thousands to buy extra insurance that offers no greater protection, no one would rationally buy a depositary bank's review of every check, or a fortiori a redundant second review in a drawee bank.

While interpreting the pre–1990 version of the U.C.C., White and Summers explained:

> Increasingly banks are little more than high-speed mechanical sorters of checks, and drawers or other parties are in much better positions to prevent losses. In such circumstances we should resist the temptation to put the loss on the more wealthy but less culpable and less capable risk avoider. To allocate the loss to the bank in such a case may make the court feel magnanimous, but one should not be misled. . Ultimately such allocation diminishes the efficiency of the system either by permitting greater losses than would otherwise occur or by causing banks to spend excess resources to avoid their recurrence.

1 Uniform Commercial Code 805 (3d ed.1988). The Delaware Supreme Court has frequently followed White and Summers's treatise in interpreting the Uniform Commercial Code. *See, e.g., Reybold Group, Inc. v. Chemprobe Technologies, Inc.*, 721 A.2d 1267, 1270 n. 11 (Del.1998);

*Mercedes–Benz of North America Inc. v. Norman Gershman's Things to Wear, Inc.*, 596 A.2d 1358, 1363 (Del.1991); *Neilson Business Equipment Center, Inc. v. Italo v. Monteleone, M.D., P.A.*, 524 A.2d 1172, 1175 (Del.1987); *Stoppi v. Wilmington Trust Co.*, 518 A.2d 82, 84 n. 4 (Del. 1986).

Our interpretation of what constitutes reasonable commercial standards for a drawee bank is consistent with the definition of "ordinary care" that was added to the U.C.C. with the 1990 revisions. *See* § 3–103(a)(7). The revised Code states:

> "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this Article or Article 4.

While discussing this provision, White and Summers explain:

> The last sentence in 3–103(a)(7) immunizes a bank that follows such automated procedures (and does not examine checks to see if there is a signature, or compare the signature with a specimen) from claims that it is *per se* guilty of negligence. In fact, we believe that 3–103(a)(7) goes further and indorses those acts, at least if the bank has no internal procedures that require such examination and if other banks generally have similar procedures. Other banks need not do exactly the same thing; it is enough to relieve a bank of responsibility if that particular bank's procedures do not "vary unreasonably" from the practice of other banks.

2 Uniform Commercial Code 250 (4th ed.1995).

Although we should not apply new provisions of the U.C.C. retroactively, in some circumstances a revision or addition is intended merely to capture the better, existing interpretations of the prior Code and therefore can be useful in interpreting prior provisions. In *Acierno*, for example, the Delaware Supreme Court relied for support on a part of the 1990 revision to Article 3 of the U.C.C. that had not yet been adopted by the Delaware legislature; the state supreme court explained that an "addition to [the] official text of the U.C.C. which is intended to clarify rather than change the meaning of the U.C.C. is useful in interpreting a state's version of the U.C.C., even though the clarifying interpretation has not been adopted by the state." 656 A.2d at 1090 (*citing Community Bank v. United States Nat'l Bank of Oregon*, 276 Or. 471, 555 P.2d 435 (Or. 1976)). The phrases "reasonable commercial standards" and "ordinary care" are not new to the Code, and it appears that the addition of the 1990 definition of "ordinary care" in § 3–103(a)(7) was intended to clarify existing law on the subject rather than introduce a departure from prior law. As White and Summers explain, "Most of the questions about bank negligence that arose under the old Code will be untouched by the revised 3–103(a)(7) definition of ordinary care." 2 Uniform Commercial Code 249 (4th ed.1995). Therefore, we find the amendment instructive.

Because the most authoritative view is that depositary banks need only conduct at most random reviews of payee indorsements for most checks, we think it follows that drawee banks need not review each check to verify that the payee indorsement is legible and matches the named payee on the front of the check. The warranties a drawee bank receives from a depositary bank underscore this logic. In sum, we hold that as a matter of law a drawee bank does not have a duty to conduct any review of payee indorsements on checks received from a depositary bank.

One last point is worth emphasizing. Despite the rule that banks are not negligent for using automated means to process checks, we need not become "apoplectic at the thought that banks have quietly escaped from all liability for forged signatures," *id.*, for the definition of bank negligence only applies when a drawer is negligent but still hoping to shift the loss on the bank. In the ordinary case of a forgery where the drawer is not negligent, the check is not properly payable and the drawee bank must recredit the drawer's account for any amount paid. Not only does this show that banks will routinely shoulder the loss, it also underscores that banks have strong incentives to adopt cost effective procedures—i.e., procedures that do not cost more than they will recoup in thwarted forgeries.

## II

Having rejected that drawee banks are obliged to review payee indorsements on checks received from other banks, we must consider the insurers' argument that for the purposes of the § 3–406 defense, a drawee bank must prove both that it was not negligent and that the depositary bank was not negligent.

One initial side issue is who properly has the burden of proof. Does the bank have the burden of showing that it was not negligent or does the drawer have the burden of showing the bank was negligent? The pre–1990 version of § 3–406 is silent on this issue, while subsection (c) of the revised version explicitly divides the burden, placing on the bank the burden of showing the drawer's negligence and placing on the drawer the burden of showing the bank's negligence. This change in § 3–406 may have been more than a mere clarification that could be applied to cases prior to its enactment. We have not found any case decided under the pre–1990 version of § 3–406 expressly stating that the drawer must prove the bank's failure to

adhere to reasonable commercial standard; meanwhile many cases have stated that under the pre–1990 version of § 3–406 the bank has the burden of showing both that the drawer was negligent and that the bank was not negligent. *See, e.g., New Jersey Steel v. Warburton*, 139 N.J. 536, 655 A.2d 1382, 1388 (N.J.1995); *In re Lou Levy & Sons Fashions, Inc.*, 988 F.2d at 314; *Hermetic Refrigeration Co. v. Central Valley Nat'l Bank, Inc.*, 493 F.2d 476, 477 (9th Cir.1974). On the other hand, these cases simply asserted, without analysis, that the bank has the burden for both, and the pre–1990 version of § 4–406, which is often interpreted analogously to § 3–406, *see Rhode Island Hosp. Trust Nat'l Bank*, 848 F.2d at 293, does explicitly provide that the bank and its customer each has the burden of proving the other's negligence. *Id.* (*quoting* § 4–406 comment 3) ("This distribution of the burden ... between the customer and the bank provides reasonable equality of treatment and requires each person asserting the negligence to establish such negligence rather than requiring either person to establish that his entire course of conduct constituted ordinary care.").

██ We find it unnecessary to resolve this issue. Because we conclude that only a drawee bank's conduct is relevant to that bank's defense under § 3–406, the issue of the banks' negligence drops from this case. We turn therefore to our analysis of why only a drawee bank's conduct is relevant to the drawee's defense under § 3–406.

The parties have only cited one case addressing whether both the drawee bank's and the depositary bank's conduct must be considered, and that case only did so in dictum and in a footnote. The footnote states in full:

> Although the issue has not been squarely addressed in Massachusetts as to whether the drawee bank must establish its own due care as well as the due care of the payor bank, such a conclusion is consistent with *Stone & Webster Engineering Corp. v. First Nat'l Bank & Trust*, [345 Mass. 1, 184 N.E.2d 358 (Mass.1962)]. Under *Stone & Webster*, the issuer may not maintain a direct action against the payor bank, but must instead proceed against the drawee bank for improperly charging an item against its account. The drawee bank is, in turn, free to pursue its remedies against the payor bank under the warranty sections of the code (§§ 3–417 and 4–207). Consistent with the procedures established by *Stone & Webster*, it is the conduct of the bank that first paid the instrument which must pass the reasonableness test under § 3–406. In any event, Merchants has failed to show that the conduct of either bank has met the standard of commercial reasonableness.

*First Nat'l Bank of Boston v. Hovey*, 10 Mass.App.Ct. 715, 412 N.E.2d 889, 894 n. 8 (1980).

Initially we note that the footnote refers to a "payor bank" as distinct from a drawee bank, but a "payor bank" is usually defined as a drawee bank. *See* Black's Law Dictionary 140 (7th ed.1999) (defining "Payor bank" as "[a]lso termed *drawee bank*"). The pre–1990 version of the U.C.C., § 4–105(b) defines a "Payor bank" as "a bank by which an item is payable as drawn or accepted." The revised 1990 version says more simply that a payor bank is "a bank that is the drawee of a draft." § 4–105(3). Read in context, *Hovey*'s footnote appears to use "payor bank" to include any bank where a check is presented.

Interestingly, *Hovey*'s assertion that "it is the conduct of the bank that first paid the instrument which must pass the reasonableness test" seems to make the drawee bank's conduct entirely irrelevant, a conclusion that would relieve drawee banks of any obligation with respect to *drawer* signatures as well as payee indorsements. We think the conclusion about drawer signatures is mistaken and reveals the underlying error in the footnote's analysis: what drawee banks must be concerned about are drawers' signa-

tures and that is the focus of the commercial practices at issue in § 3–406 when the provision is invoked by a drawee. As White and Summers indicate, "The drawee bank has the best opportunity to detect problems involving drawer's signatures." 1 Uniform Commercial Code 808 (3d ed.1988).

What *Hovey* ignores is that, under the plain language of § 3–406, the provision identifies drawee banks as one of several parties entitled to invoke the defense and then says that a drawee bank asserting the defense must comply with the reasonable commercial practices *"of the drawee's ... business."* We conclude that this means what it says: the drawee must show that it complied with the standards applied to a drawee's business, not a depositary bank's business, or some other entity's business. And as illustrated above, drawees are not in the business of reviewing payee indorsements. Because Delaware law requires us to apply the plain language of a statute, *see, e.g., Jackson v. Multi–Purpose Criminal Justice Facility*, 700 A.2d at 1205, we hold that we are obliged to confine the inquiry of reasonable commercial standards solely to the drawee's business.

The insurers object that the depositary bank's conduct should be considered under § 3–406 if, as the next section of our opinion shows, we agree with *Hovey* that a drawer cannot bring an action against a depositary bank. The insurers point out that if a depositary bank was indeed negligent in some way, the negligent drawer still would be saddled with the loss despite the depositary bank's negligence. Doesn't this defeat the purpose of § 3–406?

There are several answers to this concern. First, there is the clear language of § 3–406. But second, it simply is not true even under the insurer's theory (or under *Hovey*) that every upstream actor's conduct in handling the check is considered in allocating a loss under § 3–406. If Joe's Liquor Store was the first to take the forged check and did so negligently, no one is suggesting that the drawee bank

must be drawn into a dispute establishing what reasonable commercial standards are for Joe's and whether the store met those standards. This illustrates a broader problem with the insurers' and *Hovey's* position: it imposes on a drawee bank the obligation of trying to show that other actors conducted themselves appropriately. It is one thing to establish another party's negligence through the tools of discovery; it is another, more problematic task for one party to establish that a stranger acted properly during some unobserved and distant transaction. A related problem is that the insurers' interpretation would considerably expand the scope and complexity of litigation over forged checks.

One more important point to bear in mind is that when the drawer is not itself negligent, any negligence on the part of the depositary bank will eventually fall on that bank. The drawer will sue its drawee bank, which will be obliged to recredit the drawer's account for the forgery, and the drawee bank can then obtain repayment from the depositary bank under the presentment warranties. Thus, the depositary bank retains its incentives to be careful. And as we will indicate below, a bank that first accepts a forged check also may be subject to a payee's suit for conversion.

In essence, the insurer's argument is that we should take every opportunity to excuse a drawer's negligence and allow the drawer to shift the loss of a forgery back onto a bank. We agree that it would be defensible for the U.C.C. to ensure that whenever any bank or other entity involved with a forged check acted contrary to reasonable commercial standards, the drawer's own negligence must be excused (or excused proportionally under the revised Code). The insurer's interpretation of the U.C.C. could be a reasonable way to design the Code. But after reviewing the plain language of the pre–1990 version of § 3–406, we do not think this is the scheme adopted by the Code. Nor is it necessarily illogical as a matter of policy to take a narrower view of when a drawer's

negligence will be excused. Our high-volume, low-cost checking system depends crucially on drawers not being negligent, and a more expansive view of § 3–406 that draws in the conduct of every actor in the payment system would make litigation much more cumbersome.

### III

The final issue we must address is whether the insurers as drawers can maintain an action for conversion or negligence against a depositary bank, Midlantic Bank in this case. The parties do not dispute the District Court's determination that we must apply New Jersey law since the checks were deposited at a Midlantic branch in New Jersey. *See* N.J.S.A. 12A:4–102(2).

■ Although again we apply the pre–1990 version of the U.C.C., we note that § 3–420, which was added with the 1990 revision to the U.C.C., expressly disavows that a conversion action is available to drawers: "An action for conversion of an instrument may not be brought by (i) the issuer . . . of the instrument. . . ." § 3–420(a). Comment 1 to the section explains: "Under former Article 3, the cases were divided on the issue of whether the drawer of a check with a forged indorsement can assert rights against a depositary bank that took the check. The last sentence of Section 3–420(a) [quoted above] resolves the conflict. . . ."

The question in our case, therefore, is whether prior to the introduction of § 3–420(a) New Jersey was one of the jurisdictions that allowed drawers to bring an action for conversion or negligence. It was not. *See Brighton, Inc. v. Colonial First Nat'l Bank*, 176 N.J.Super. 101, 422 A.2d 433 (N.J.Super.App.Div.1980), *aff'd*, 86 N.J. 259, 430 A.2d 902 (1981); *Western Union Tel. Co. v. Peoples Nat'l Bank in Lakewood*, 169 N.J.Super. 272, 404 A.2d 1178 (N.J.Super.App.Div.1979); *Life Insurance Co. of Virginia v. Snyder*, 141 N.J.Super. 539, 358 A.2d 859 (N.J.Dist.Ct.

1976); *First Nat'l Bank, Bloomingdale v. North Jersey Trust Co.*, 18 N.J. Misc. 449, 14 A.2d 765 (N.J.1940). *See also Bank Polska Kasa Opieki v. Pamrapo Sav. Bank*, 909 F.Supp. 948 (D.N.J.1995). That New Jersey may allow a payee to maintain an action for conversion, *Martin Glennon, Inc. v. First Fidelity Bank, N.A.*, 279 N.J.Super. 48, 652 A.2d 199 (N.J.Super.App.Div.1995), does not lend any authority for a drawer to do so. Unlike a payee who had possession of a check, a drawer has no doctrinal basis for claiming conversion: "one's own check is an obligation, not a right. It is a liability that cannot be stolen, not an asset that can be stolen." 2 James J. White & Robert S. Summers 220 Uniform Commercial Code (4th ed.1995). One might argue that there is a difference between an action for conversion and one for negligence, but the insurers do not identify any authority suggesting that New Jersey would create under a negligence theory a cause of action it prohibited under a conversion theory.

### IV

To summarize, we hold that under Delaware law a drawee bank is not obliged to review payee indorsements on checks received from a depositary bank. In evaluating a drawee bank's defense under the pre–1990 version of § 3–406, we conclude that under Delaware law only the drawee bank's conduct is relevant to determining whether the bank complied with reasonable commercial standards. Finally, applying New Jersey law, we agree with the District Court that a drawer has no cause of action against a depositary bank for conversion or negligence.

In light of these conclusions we need not reach the parties' dispute over the calculation of interest. We will remand this case to the District Court for a factfinder to determine whether the insurers were negligent and whether that negligence sub-

stantially contributed to the making of the forgeries.[1]

---

1. Without expressing any view about the care exercised by the insurers, we reject the banks' argument that the District Court implicitly made findings about the insurers' negligence when the Court suggested that the parties settle their dispute over the one check governed by the revised 1990 version of § 3–406.