10 Mass. App. Ct. 715                                        715

First National Bank of Boston *v.* Hovey; New England Merchants Nat'l Bank; Markus.

THE FIRST NATIONAL BANK OF BOSTON, conservator, *vs.*
CHARLES F. HOVEY & others, trustees;[1] NEW ENGLAND
MERCHANTS NATIONAL BANK & another, third-party
defendants;[2] FREDERICK E. MARKUS & another, fourth-
party defendants[3]
(and two companion cases).

Suffolk.    February 12, 1980. — November 21, 1980.

Present: GREANEY, ROSE, & PERRETTA, JJ.

*Negotiable Instruments,* Forgery. *Uniform Commercial Code,* Wrongful transfer of securities. *Notice,* Timeliness.

Where the owner of stock had no recollection of receiving from a mutual fund a quarterly statement which reflected a wrongful transfer of stock from the owner's account and where, on the day following his receipt of the next quarterly statement, the owner notified the fund of the discrepancy between what the owner had held and what the statement indicated, a finding was warranted that the owner had notified the fund that the stock had been wrongfully taken within a reasonable time after he had notice of that fact as required by G. L. c. 106, §§ 8-101 through 8-406. [718-719]

In an action to compel a trust in which the plaintiff held stock to return shares wrongfully taken, the trust did not bear its burden of establishing the defense of unreasonable notice under G. L. c. 106, § 8-405(1), where the trust failed to show when the plaintiff himself had notice of the wrongful transfer or the date on which the plaintiff notified the trust of the wrongful transfer. [719-720]

In an action to compel a mutual fund in which the plaintiff held stock to return shares wrongfully taken, a finding was warranted that the plaintiff's notice to the fund of the wrongful taking on December 30, 1975, after having received a quarterly statement reflecting the

[1] Ernest E. Monrad, Hollis P. Nichols, William A. Oates, Jr., and C. Earl Russell, trustees of Northeast Investors Trust.

[2] Crocker National Bank.

[3] Philip K. Markus.

transfer sometime after December 17, 1975, was seasonable for purposes of G. L. c. 106, §§ 8-101 through 8-406. [720]

A drawee bank was liable to the issuer for payment of a check under a forged endorsement where the bank did not meet its burden of proof or the affirmative defense provided by G. L. c. 106, § 3-406, in that it failed to establish that it acted in accordance with reasonable commercial standards of the banking business within the meaning of § 3-406. [720-724]

CIVIL ACTIONS commenced in the Superior Court on March 24, March 29, and May 25, 1976, respectively.

The cases were tried before *Linscott, J.*

*Allan van Gestel* for the Massachusetts Investors Growth Stock Fund, Inc., & others.

*Robert J. Muldoon, Jr. (Thomas J. Urbelis* with him) for The First National Bank of Boston & others.

*William Shields, III,* for the trustees of Northeast Investors Trust.

ROSE, J. The First National Bank of Boston, as conservator of Frederick Markus's property, brought an action against the trustees of the Northeast Investors Trust (hereinafter NIT) following allegedly wrongful transfers and liquidation of stock originally held by Frederick Markus to Philip Markus, Frederick's son. Similar actions were brought by the First National Bank and other trustees of the Paula Anna Markus Foundation (hereinafter the Foundation) against the Massachusetts Growth Stock Fund, Inc. (hereinafter MIGS), and the Vance, Sanders Common Stock Fund, Inc. (hereinafter VS). The cases were consolidated for trial and for appeal. The defendants appeal from judgments in favor of the plaintiffs. In addition, defendant NIT appeals from the judgment dismissing its third-party complaint against New England Merchants National Bank (hereinafter Merchants) seeking to compel Merchants to recredit its account for the payment of a NIT check bearing an unauthorized signature. We affirm in part and reverse in part.

10 Mass. App. Ct. 715                                    717

First National Bank of Boston *v.* Hovey; New England Merchants Nat'l Bank; Markus.

Briefly, Philip Markus, through the use of a forged power of attorney, successfully ordered, at various times between May and December, 1975, each of the defendants to transfer stock from the Foundation and Frederick Markus to him and subsequently to liquidate the stock and to send the proceeds directly to him. The facts relating to each of the transactions will be included as necessary with the discussion of the issues raised by the parties.

I. *Contributory Negligence.*

The only issue the defendants raise on appeal is whether the plaintiffs gave "proper notice" of the wrongful transfer of securities to the proper parties within the meaning of the "Investment Securities" provisions of the Massachusetts Uniform Commercial Code (G. L. c. 106, §§ 8-101 through 8-406[4]). The trial judge found on the basis of stipulated facts, exhibits and testimony: "All instruments, powers of attorney, letters, stock powers and endorsements by which Philip K. Markus brought about the liquidation and registration of the assets of the plaintiffs during 1975 referred to in the stipulation and marked as exhibits and testified to by the witnesses, were forgeries." The defendants do not question this finding. Section 8-404(2) of G. L. c. 106, provides in part:

> "Where an issuer has registered a transfer of a security to a person not entitled to it the issuer on demand must deliver a like security to the true owner unless . . . (b) the owner is precluded from asserting any claim for registering the transfer under subsection (1) of the following section, . . ."

By virtue of § 8-404(2), since the defendants transferred the plaintiffs' stock to a person not entitled to it, the defendants must issue to the plaintiffs like securities unless the plaintiffs are precluded from asserting such a claim under § 8-405(1), which provides:

---

[4] All quotations from c. 106 are from that statute as inserted by St. 1957, c. 765, § 1.

"Where a security has been lost, apparently destroyed or wrongfully taken and the owner fails to notify the issuer of that fact within a reasonable time after he has notice of it and the issuer registers a transfer of the security before receiving such a notification, the owner is precluded from asserting against the issuer any claim for registering the transfer under the preceding section or any claim to a new security under this section."

The question therefore becomes whether the plaintiffs notified the defendants that their stock had been wrongfully taken within a "reasonable time"[5] after they had "notice"[6] of that fact. The question of reasonable notice is a question of fact. *Bowling Green, Inc.* v. *State Street Bank & Trust Co.*, 425 F.2d 81 (1st Cir. 1970). See also *Ibanez* v. *Farmers Underwriters Assn.*, 14 Cal. 3d 390, 394 (1975). This court is bound to accept findings of fact unless demonstrated to be clearly erroneous. See *Employer's Liab. Assur. Corp.* v. *Vella*, 366 Mass. 651, 655 (1975); Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). The judge's findings were not clearly erroneous. The finding with respect to each defendant is discussed separately below.

(a) *MIGS.* On June 11, 1975, MIGS, by relying on the forged power of attorney, wrongfully transferred from the Foundation's MIGS account 5,364.703 shares of the Foundation's total account of 5,463.703 shares. Although a MIGS representative testified that a quarterly statement of the account, which showed the decrease in the number of shares held by the Foundation, was sent to Frederick Markus, as trustee of the Foundation, on June 27, 1975, Frederick testified that he had no recollection of receiving the statement.

---

[5] Section 1-204(2) provides: "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."

[6] The definitional section of Article 8, § 8-102, incorporates the Article 1 definition of notice to include constructive notice. Section 1-201(25) provides in part: "A person has 'notice' of a fact when (a) he has actual notice or knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists . . . ."

A second quarterly statement was mailed to Frederick in late September and received on October 1, 1975. The following day, Frederick notified MIGS of the suspicious discrepancy between what the Foundation had held and what the statement indicated. We cannot say that the judge was clearly wrong in finding that Frederick gave notice of these facts within a reasonable time. See, for example, *Arizona Pub. Serv. Co.* v. *Gammons,* 21 Ariz. App. 400, 402 (1974), where the court upheld the trial judge's finding that the plaintiff shareholder notified the defendant within a reasonable time of notice of a wrongful transfer of her shares, a fact of which she had record notice by virtue of not receiving the December, 1969, quarterly dividend statement, but which she did not report until February 25, 1970.

(b) *NIT.* On April 18, 1975, Frederick pledged as security for a loan to Philip from The First National Bank of Boston the 3,200 shares Frederick held individually in NIT. On October 22, 1975, after Philip defaulted on the loan, Frederick requested NIT by letter to liquidate 1,930 of the shares, remitting the proceeds to the First National Bank, and to reissue a certificate to him for the remaining shares. On November 5, 1975, Philip, through the use of a forged power of attorney,, dated April 17, 1975, directed NIT to liquidate 1,270 of the remaining shares and remit the proceeds to him and on November 5, 1975, NIT delivered to Philip a check for $17,018 representing the proceeds from the sale of the 1,270 shares. On December 3, 1975, Frederick gave notice to the First National Bank not to honor the forged power of attorney.

NIT, by means of incorporating by reference the arguments made by VS and MIGS on the issue of reasonable notice, argues that the June 27, 1975, MIGS quarterly statement was notice to Frederick that the NIT stock had been lost, destroyed or wrongfully taken and that therefore the notice to NIT was unreasonable as a matter of law. The facts belie this argument, for, as late as October 24, 1975, when NIT remitted the proceeds of the sale of the 1,930 shares to the First National Bank, Frederick had actual

notice that he was the owner of the NIT shares. Even if the June 27, 1975, MIGS quarterly statement was sufficient notice of wrongful transfer in the MIGS account, it is not sufficient notice of any wrongful transfer in the NIT account. Furthermore, unless it is assumed that Frederick's notice to the First National Bank on December 3, 1975, to disregard the forged power of attorney is notice to NIT within the meaning of § 8-405(1), NIT failed to put in the record the date on which Frederick notified NIT of the wrongful transfer. Since NIT bears the burden of establishing the defense of unreasonable notice under § 8-405(1), the trial judge was not clearly wrong in finding for the plaintiffs on this issue. See *Ibanez* v. *Farmers Underwriters Assn., supra.*

(c) *VS.* On December 12, 1975, VS, by relying on the forged power of attorney, wrongfully transferred 7,490.216 of the Foundation's total of 14,966.216 shares held in VS to Philip. Sometime after December 17, 1975, Frederick received a quarterly statement reflecting the transfer. On December 30, 1975, Frederick gave notice to Merchants to stop any transfer in the VS account. VS, like NIT, argues that the MIGS June 27, 1975, quarterly statement was notice to Frederick that the VS stock had been lost, destroyed or wrongfully taken and that therefore the lapse between June 27, 1975, and December 30, 1975, is, as a matter of law, unreasonable. We reject the argument that notice of wrongful transfers in the MIGS account is notice of wrongful transfers in the VS account and hold that the judge's finding that the December 30, 1975, notice was seasonable is not clearly erroneous.

II. *NIT's Third-Party Complaint.*

NIT appeals from the dismissal of its third-party complaint against Merchants for honoring NIT's check under an alleged forged endorsement. Because we hold that Merchants failed to meet its burden of proof in establishing that it acted in accordance with reasonable commercial standards of the banking business within the meaning of G. L. c. 106, § 3-406, we vacate the dismissal and enter judgment for NIT on its third-party complaint.

On November 5, 1975, Philip Markus requested NIT, under the authority of the April 17, 1975, forged power of attorney, to liquidate 1,270 shares in Frederick's NIT account. On November 7, 1975, NIT issued a check to Philip for $17,018 made payable to Frederick Markus. On the same day, Philip deposited $9,018 of the proceeds of the check in Frederick's Home Savings Bank (hereinafter Home) account and obtained the remaining $8,000 in cash. Although the judge made no specific finding of fact that the check was paid under an unauthorized signature, NIT argues that this conclusion is compelled by the stipulated facts, pleadings and findings of the trial judge. We agree. The trial judge's conclusion that "no party . . . is entitled to any relief except the plaintiffs," cannot be sustained unless it can be found that the signature on the check was not unauthorized or that Merchants met its burden of proof on its affirmative defense. Since neither position is supportable on the evidence, we reverse.

The trial judge found that the April 17, 1975, power of attorney was a forgery. Merchants admits in its fourth-party complaint against Frederick Markus and Philip Markus that when Philip presented the check to Home for payment, he also presented the forged power of attorney and endorsed the check as follows: "Frederick E. Markus/ Philip K. Markus/By Power of Attorney/Nov. 7, 1975." Section 1-201(43) provides: "'Unauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery." A check presented under an unauthorized signature, as was the case here, is not "properly payable" within the meaning of G. L. c. 106, § 4-401(1), and the drawee is liable to the issuer for payment of a check not properly payable. See *Stone & Webster Engr. Corp.* v. *First Natl. Bank & Trust Co.*, 345 Mass. 1 (1962).

Merchants relies on the affirmative defense provided by G. L. c. 106, § 3-406, which follows:

"Any person who by his negligence substantially contributes to a material alteration of the instrument or

> to the making of an unauthorized signature is preclud-
> ed from asserting the alteration or lack of authority
> against a holder in due course or against a drawee or
> other payor who pays the instrument in good faith and
> in accordance with reasonable commercial standards
> of the drawee's or payor's business."

Merchants argues that by failing to follow Frederick's in-
structions of October 22, 1975, to re-issue a certificate for the
remaining shares in his NIT account and by liquidating these
shares at Philip's instruction under a forged power of at-
torney on November 5, 1975, NIT, by its own negligence
substantially contributed to the making of the unauthorized
signature. It cites no Massachusetts authority and we have
found none describing what actions on the part of an issuer
constitute negligence that substantially contributes to an un-
authorized signature. The official comment to § 3-406 ex-
pressly states that no attempt is made to define negligence.[7]

Because we hold that Merchants failed to establish that it
acted in good faith and in accordance with reasonable com-
mercial standards under § 3-406, we need not and do not
decide the parameters of the test of negligence which sub-
stantially contributes to a material alteration or to an
unauthorized signature under § 3-406, nor need we decide
whether NIT's alleged negligence lies within these parame-
ters. We leave that decision for another day.

The record is devoid of any evidence on how NIT's check
was paid, what procedures were followed and whether
these procedures were commercially reasonable.[8] The

---

[7] Section 3-406, Comments 3 and 7, appearing in 2 Uniform Laws an-
not., U.C.C. at 348, 349 (Master ed. 1977).

[8] Although the issue has not been squarely addressed in Massachusetts as
to whether the drawee bank must establish its own due care as well as the
due care of the payor bank, such a conclusion is consistent with *Stone &
Webster Engr. Corp.* v. *First Natl. Bank & Trust, supra.* Under *Stone &
Webster,* the issuer may not maintain a direct action against the payor
bank, but must instead proceed against the drawee bank for improperly
charging an item against its account. The drawee bank is, in turn, free to
pursue its remedies against the payor bank under the warranty sections of
the code (§§ 3-417 and 4-207). Consistent with the procedures established

§ 3-406 defense requires that Merchants make an affirmative showing that it observed reasonable commercial standards. That the reasonable care standard applies to the affirmative defense provided by § 3-406 was established *by Industrial Natl. Bank* v. *Leo's Used Car Exch., Inc.*, 362 Mass. 797 (1973). The court in that case concluded that while the good faith mandate of § 3-302(1)(b) requires a showing of only "honesty in fact in the conduct or transaction concerned" (§ 1-201[19]), the good faith mandate of § 3-406 requires the more extensive showing of honesty in fact and the observance of reasonable commercial standards. Although the parties have cited no Massachusetts authority and we have found none, the overwhelming majority of the jurisdictions that have dealt with this issue have placed the burden on the bank to show its own due care. In *Perley* v. *Glastonbury Bank & Trust Co.*, 170 Conn. 691 (1976), the plaintiff issuer sued the drawee bank which, in turn, impleaded the payor bank, for honoring the plaintiff's check over a forged indorsement. The court held that, although the bank had established that the procedures it had followed in paying the check were common among banks, it had failed to show that such procedures were reasonable. In the absence of such an affirmative showing, the risk of loss must fall on the bank. See also *Hermetic Refrigeration Co.* v. *Central Valley Natl. Bank, Inc.*, 493 F.2d 476 (1974); *Bank of So. Md.* v. *Robertson's Crab House, Inc.*, 39 Md. App. 707 (1978); *Transamerica Ins. Co.* v. *United States Natl. Bank*, 276 Or. 945 (1976); *Swiss Baco Skyline Logging* v. *Haliewicz*, 18 Wash. App. 21 (1977). Indeed, most jurisdictions that have addressed the issue agree that where the bank fails to follow reasonable commercial standards, the § 3-406 defense is simply not available notwithstanding any negligence on the part of the issuer. See *East Gadsden Bank* v. *First City Natl. Bank*, 50 Ala. App. 576 (1973);

by *Stone & Webster*, it is the conduct of the bank that first paid the instrument which must pass the reasonableness test under § 3-406. In any event, Merchants has failed to show that the conduct of either bank has met the standard of commercial reasonableness.

*Empire Moving & Warehouse Corp.* v. *Hyde Park Bank & Trust,* 43 Ill. App. 3d 991 (1976); *Mott Grain Co.* v. *First Natl. Bank & Trust Co.,* 259 N.W. 2d 667 (N.D. 1977); *Do-all Dallas Co.* v. *Trinity Natl. Bank,* 498 S.W.2d 396 (Tex. App. 1973); *Seattle First Natl. Bank* v. *Pacific Natl. Bank,* 22 Wash. App. 46 (1978). It follows that, in the absence of any showing of commercial reasonableness, the bank cannot prevail under the § 3-406 defense. The defendants cite *Cooper* v. *Union Bank,* 9 Cal. 3d 371 (1973), for the proposition that, since nothing on the face of the instrument would have led the bank to suspect any irregularity, it was acting in accordance with reasonable commercial standards. We find this case inapposite, for in *Cooper* the trial judge specifically found and there was substantial evidence in the record to support such a finding, that the bank had acted in good faith and in accordance with reasonable commercial standards. In the instant case, the defendant makes the bare assertion that because the record indicates that the power of attorney was a "good forgery," the bank acted in accordance with reasonable commercial standards. However, Merchants introduced no evidence on what procedures it or the payor bank followed, whether these procedures are common among banks and whether, even if common, the procedures are reasonable.

Finally, Merchants argues that if it is held liable, the amount of the judgment against NIT and, in turn, the amount of the judgment against Merchants should be reduced to $8,000 plus interest. We agree that the judgments in favor of the plaintiff and the third-party plaintiff in the principal case should be reduced to reflect the extent of the harm. See *Gordon* v. *State Street Bank & Trust Co.,* 361 Mass. 258 (1972). The judge below found that Frederick Markus never profited from the activities of Philip Markus and therefore ordered NIT to deliver to the plaintiff a certificate representing 1,270 shares of stock in NIT and to pay the plaintiff a sum equal in value of all dividends, interest, and capital gains that would have been earned had NIT not wrongfully liquidated the stock. We may not upset the trial

judge's factual findings unless they are clearly erroneous. (Mass.R.Civ.P. 52[a]). The finding that Frederick never profited from Philip's activities is clearly erroneous. The record indicates that Philip presented the NIT check for $17,018 to Home Savings Bank where Frederick maintained an account. Home deposited $9,018 of the proceeds of the check in Frederick's account and remitted the remaining $8,000 to Philip in cash. There is no indication that the $9,018 was subsequently wrongfully withdrawn from Frederick's account or that Frederick did not benefit to the extent of $9,018 from Philip's activities.

III. *Disposition.*

In the principal case we vacate the judge's judgment in favor of The First National Bank of Boston, as conservator, awarding it a certificate representing 1,270 shares of NIT stock plus interest, dividends and capital gains and remand the case to the Superior Court for a determination of the proper amount of the judgment. By way of guidance, the plaintiff's recovery should be limited to the number of shares represented by $8,000 calculated on the basis of their market value on the date they were wrongfully liquidated, plus the monetary value of all interest, dividends and capital gains on the resulting number of shares, together with the monetary value of all interest, dividends and capital gains the plaintiff would have earned but for the wrongful transfer on the number of shares represented by the $9,018, less the interest the plaintiff earned on that sum from the date it was deposited in the plaintiff's account to the date of judgment. The judgment in the principal case with respect to the third-party complaint is reversed and judgment is to be entered for the third-party plaintiff NIT in the amount of $8,000. The judgments in favor of the plaintiff Foundation in its actions against VS and MIGS are affirmed.

*So ordered.*