GOVONI & SONS CONSTRUCTION CO., INC., & others[1] *vs.*
MECHANICS BANK[2]; JAMES A. MADDALENA & others,[3]
third-party defendants.

No. 97-P-117.

Worcester. November 17, 1998. - February 23, 2001.

Present: ARMSTRONG, C.J., DREBEN, & LAURENCE, JJ.

*Bank. Negotiable Instruments,* Defenses, Indorsement, Payment, Holder in due course. *Negligence,* Bank, In cashing check, Comparative. *Estoppel. Indemnity. Consumer Protection Act,* Bank, Unfair or deceptive act. *Words,* "Properly payable."

Discussion of the term "properly payable" as it is used in G. L. c. 106, § 4-401(1), inserted by St. 1957, c. 765, § 1, and as amended by St. 1998, c. 24, § 8. [39-41]

In a civil claim against a bank for wrongful debit of the plaintiffs' accounts of items not properly payable under G. L. c. 106, § 4-401, the bank was properly held liable to the plaintiffs, where it had paid the proceeds to an unauthorized bearer on unindorsed checks made payable to the bank and deposited there in the bearer's accounts, without making any inquiry into the bearer's authority [41-42]; further, the bank's asserted defenses based on the "fictitious payee" rule [42-43], estoppel [44-46], holder in due course status [47-48], and common law indemnification [49] were all without merit.

Principles of comparative negligence were not applicable to reduce the liability of a bank for wrongful debit of items not properly payable under G. L. c. 106, § 4-401, where the claim was one of strict liability and where G. L. c. 231, § 85, was displaced by the particular applicable provisions of the Uniform Commercial Code. [48-49]

A bank was liable for improper dispersal of proceeds of plaintiffs' unindorsed checks to a person other than the payee (the Commonwealth), where the bank's failure to make any inquiry to ascertain whether the checks were presented by an agent of the Commonwealth or deposited to an account of the Commonwealth was commercially unreasonable as a matter of law. [49-51]

---

[1] G.O.V. Realty Corp. and Govoni Realty, Inc.

[2] There is some indication that since the filing of the complaint, Mechanics Bank may have been involved in several mergers and a successor entity may now bear its liabilities. No formal substitution of parties appears in the record before us.

[3] A.R. Davis Associates, Inc., Donald Govoni, Sr., and Donald Govoni, Jr.

A bank's actions, even if negligent, in wrongfully debiting plaintiffs' accounts of items not properly payable under G. L. c. 106, § 4-401, did not constitute unfair and deceptive practices under G. L. c. 93A, § 11. [51]

CIVIL ACTION commenced in the Superior Court Department on February 25, 1991.

The case was heard by *James P. Donohue,* J.

*Herbert Lemelman (Frederick Trilling & Philip F. Mulvey, Jr.,* with him) for the plaintiffs.

*John O. Mirick (William S. Rogers, Jr.,* with him) for Mechanics Bank.

ARMSTRONG, C.J. These cross appeals concern the proper allocation between a bank and its customers of the loss brought about through a check fraud scheme perpetrated by the customers' accountant. The judge's findings of fact, summarized below, were supported by the evidence adduced at the bench trial.

The customers (the Govonis) are small, family-owned companies, of which Henry Govoni was president and Donald Govoni, Sr., and Donald Govoni, Jr., were the treasurers. For more than twenty years, the Govonis employed James A. Maddalena as their accountant. The Govonis placed their trust in Maddalena, allowing him to keep their financial records, reconcile their checkbooks, and prepare their taxes. When Maddalena requested tax checks from the treasurers, they simply signed checks in the requested amounts and gave them back to Maddalena for routing. They did not supervise, question or audit him, nor did they request receipts or review bank statements or tax returns.

During the period at issue in this litigation, that is, between February, 1988, and December, 1990, the Govonis, guided by falsely inflated tax returns prepared by Maddalena, drew numerous checks to the order of the Commonwealth of Massachusetts or the Division of Employment Security (DES) to pay State taxes (the Commonwealth/DES checks, totaling $147,422.89), and to the order of the defendant Mechanics Bank to pay Federal taxes (the Mechanics Bank checks, totaling $503,352.08).[4] These checks were drawn on various Govoni accounts

---

[4]A corporation can pay Federal taxes at the bank by depositing funds into a tax account there. The company makes its check payable to the bank and presents it with a Federal tax deposit slip. No tax deposit slips accompanied

maintained at the Mechanics Bank. Instead of using them to pay taxes, Maddalena deposited the checks into the account of his own accounting company, A.R. Davis Associates, Inc. (A.R. Davis), which account was also maintained at the Mechanics Bank.

Maddalena accomplished his fraud by making deposits to his A.R. Davis account at the bank's branch office in Holden, where he was a known and regular customer,[5] during times when the branch was busy. He would bury the Govonis' unindorsed checks in multiple item deposits of checks payable to A.R. Davis. Many deposits had at least eight items, and some had as many as sixty-one. The bank's practice on multi-item deposits was for its tellers to quickly "fan" (i.e., flip through) the checks, scanning the back sides for missing indorsements and returning unindorsed checks to the presenter. However, the tellers were not required to inspect the face of a check to ensure it was indorsed by the named payee. Moreover, depending on the level of activity at the branch, the number of customers waiting in line, and familiarity with the depositor, a teller could entirely dispense with fanning. The judge inferred that in Maddalena's case, because he was a regular customer presenting multi-item deposits during busy times, the tellers did not fan for indorsements and were thus unaware that he had inserted the Govonis' unindorsed checks into the multi-item stacks.

After Maddalena presented a stack of checks, the tellers then entered a provisional credit to the A.R. Davis account for the total amount written by Maddalena on the deposit slip. The checks were next sent to a central processing center for "proofing," a process of checking the amount indicated on each deposit slip against a manual totaling of the individual checks accompanying each deposit slip. Proofing did not include the verification of signatures or indorsements. After proofing, each check was stamped with a Mechanics Bank processing stamp.

Maddalena's deposits, so the bank was unaware that the Govonis drew these checks intending to pay Federal taxes.

The bank does not provide a similar service for State taxes. If a teller observes a customer bringing to the counter tax checks payable to the Commonwealth or the DES, the teller returns the checks to the customer without action.

[5] However, there was no evidence that Maddalena was known by bank personnel to be the Govonis' accountant. The bank does not argue that Maddalena possessed actual or apparent agency authority to accept the check proceeds.

The checks were next sent through an automated sorter. For checks such as these, drawn on one account at the bank and deposited to another account at the bank, the sorting process resulted in the drawer's account being debited and the depositor's account receiving final credit, both as of day's end. The sorting machine diverted individual checks of $7,500 or more for manual review; checks below this amount were stored without further review. Manual review included verifying that the checks were indorsed by the payee. Of the 132 checks fraudulently deposited, twenty-nine Mechanics Bank checks and six Commonwealth/DES checks met the $7,500 threshold and were manually reviewed. The twenty-nine Mechanics Bank checks raised no questions during manual review because the processing stamp administered during proofing was treated as a valid indorsement of the bank, the named payee. Following a bank policy of processing State tax checks despite a lack of indorsement, the six unindorsed Commonwealth/DES checks were also not questioned. The bank's policy was intended to prevent the Commonwealth from assessing interest and penalties for late tax payments against customer/taxpayers.

As a result of these procedures, which testimony showed to be identical to those of comparable banks in the area (including, at the time of trial, BayBank, Shawmut, and Bank of Boston), Maddalena was able to deposit into his A.R. Davis account 132 checks payable to the bank, the Commonwealth or the DES, which collectively represented $650,774.97 of the Govonis' funds.[6]

In December, 1990, the Govonis discovered Maddalena's fraud and in February, 1991, instituted this action against the bank, asserting claims they styled as common law negligence, money had and received, and conversion under the Uniform Commercial Code, as well as claims under G. L. c. 93A, § 11. The bank brought third-party claims against Maddalena and A.R. Davis for breach of transfer warranties, conversion, fraud, and common law indemnification, and against the two individual Govoni treasurers for indemnification. After a bench trial, with respect to the Mechanics Bank checks the judge rejected the Govonis' conversion and money had and received claims, but

---

[6]Although the judge made no finding on the point, there are suggestions in the record that after the checks would clear, Maddalena would withdraw the funds from the A.R. Davis account at the bank. It is unclear what happened to the money thereafter.

found the bank negligent, adopting the negligence standard articulated in *Sun 'n Sand, Inc.* v. *United Cal. Bank,* 21 Cal. 3d 671, 692-696 (1978). He also found the Govonis twenty-five percent negligent and accordingly reduced the award on the Mechanics Bank checks under the comparative negligence statute, G. L. c. 231, § 85. The judge found for the bank on all counts as to the Commonwealth/DES checks. Finally, he rejected the bank's claims against the two Govoni treasurers and the Govonis' claims against the bank under G. L. c. 93A. Both the Govonis and the bank appealed.[7]

1. *Checks payable to the order of Mechanics Bank.* Although the Govonis characterized their action as sounding in conversion under the Uniform Commercial Code (see G. L. c. 106, § 3-419, inserted by St. 1957, c. 765, § 1),[8] or in money had and received or negligence under the common law, the allegations of their complaint[9] are properly characterized as setting out a claim of wrongful debit because the checks were not properly payable to Maddalena under G. L. c. 106, § 4-401(1), inserted by St. 1957, c. 765, § 1.[10] This is a common law claim that was retained under the Uniform Commercial Code. See *Stone & Webster Engr. Corp.* v. *First Natl. Bank & Trust Co.,*

---

[7]Neither Maddalena nor A.R. Davis has appealed from that part of the judgment ordering them to indemnify Mechanics Bank.

[8]In 1990, the National Conference of Commissioners on Uniform State Laws, working in conjunction with the American Law Institute, made substantial revisions to Articles 3 and 4 of the Uniform Commercial Code. Subsequently, amended versions of these articles were adopted in Massachusetts by St. 1998, c. 24, § 8, which took effect May 13, 1998. Because the events in this case preceded that date, unless otherwise noted, citations to applicable sections of the Uniform Commercial Code, G. L. c. 106, are to versions in effect prior to the 1998 amendments — generally, those versions appearing in St. 1957, c. 765, § 1.

[9]Counts two, four and six of the complaint alleged that the checks "were paid by the Defendant Bank and debited against the account of [each plaintiff], for which [each plaintiff] received no benefit, and misappropriated and credited funds to the account of another depositor of the said Defendant Bank," and that the bank "breached its contract of normal banking relationship with [each plaintiff] when it diverted the proceeds pursuant to the direction of a presentor lacking [authority] to so handle the proceeds."

[10]That subsection provided that "[a]s against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft." Similar language appears in the 1998 amended code. See G. L. c. 106, § 4-401(*a*), as appearing in St. 1998, c. 24, § 8.

345 Mass. 1, 9-11 (1962); *Siegel* v. *New England Merchs. Natl. Bank*, 386 Mass. 672, 675 (1982).[11]

As the phrase "properly payable" was left effectively undefined by the original code,[12] it is appropriate to ascertain its meaning by reference to the common law. See White & Summers, Uniform Commercial Code § 18-3, at 878 (3d ed. 1988). While the parties have not cited, and we have not found, a Massachusetts case in which a bank has made payment to an unauthorized bearer on an unindorsed check made payable to the bank itself, there appears to be a general (and perhaps universal) rule in other jurisdictions:

> "Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer's agent to receive payment."[13]

*Bank of S. Md.* v. *Robertson's Crab House*, 39 Md. App. 707, 715 (Ct. Spec. App. 1978), quoting from 9 C.J.S. Banks & Banking § 340, at 683 (1938).[14] See *Dalton & Marberry, P.C.*

---

[11]A bank and its depositor are in the contractual relation of debtor and creditor, the terms of which are subject to Article 4 of the Uniform Commercial Code. The principles articulated in the plaintiffs' common law claims for negligence and money had and received (see note 9, *supra*) are implicit in a § 4-401(1) claim that a drawee bank should be made to recredit the depositor's account with the amount of any unauthorized payment. See *Stone & Webster Engr. Corp.* v. *First Natl. Bank & Trust Co.*, *supra* at 5, 9.

[12]General Laws c. 106, § 4-104(1)(i), inserted by St. 1957, c. 765, § 1, stated only that " '[p]roperly payable' includes the availability of funds for payment at the time of decision to pay or dishonor." The 1998 amended code, however, provides that "[a]n item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank." G. L. c. 106, § 4-401(*a*), as appearing in St. 1998, c. 24, § 8.

[13]The rationale for the rule is venerable and straightforward: "The use of the defendant's name as payee of the check indicated the drawer's intention to lodge the moneys in its custody, and place them under its control . . . . The language of the check making the funds payable only upon the order of the defendant imposed upon it the duty of seeing that they were not, through its agency, improperly disbursed after it had received them. They could not safely pay out such funds except under the direction of their lawful owner." *Sims* v. *United States Trust Co. of N.Y.*, 103 N.Y. 472, 476 (1886).

[14]While the Govoni companies had outstanding loans with the bank, there

v. *NationsBank, N.A.*, 982 S.W.2d 231, 234 & n.2 (Mo. 1998), and cases cited. This rule is consistent with the code, and we have found no jurisdiction rejecting it.[15] The results reached in somewhat comparable Massachusetts cases convince us that the rule expresses the law of the Commonwealth.[16]

Based on this rule, the Mechanics Bank checks were not properly payable from the Govoni accounts absent inquiry by the bank into Maddalena's authority to receive the proceeds.[17] See *Master Chem. Corp.* v. *Inkrott*, 55 Ohio St. 3d 23, 24

---

was uncontradicted testimony that they were up to date on the loan payments. Since the proceeds of the checks were applied to the A.R. Davis account of Maddalena rather than to reduce the Govonis' indebtedness, the fact that the bank was servicing loans of the Govonis does not take the case out from under the general rule.

[15] The cases following this rule, both before and after the emergence of the code, are legion. See Annot., Liability of Bank Which Diverts Checks or Drafts Drawn to Its Order to a Use Other Than That of the Drawer, 82 A.L.R. 1372 (1933); Annot., Duty & Liability of Bank in Respect of a Depositor's Check Drawn Upon & Payable to the Bank, 138 A.L.R. 853 (1942); Whaley, Negligence & Negotiable Instruments, 53 N.C. L. Rev. 1, 15-17 (1974); Annot., Liability of Bank for Diversion to Benefit of Presenter or Third Party of Proceeds of Check Drawn to Bank's Order by Drawer Not Indebted to Bank, 69 A.L.R.4th 778 (1989); 9 C.J.S. Banks & Banking § 327 (1996).

[16] See *Quincy Mut. Fire Ins. Co.* v. *International Trust Co.*, 217 Mass. 370, 373 (1914) (charging bank with notice, from face of check, that town treasurer lacked authority to indorse for circulation check payable to town, following *Franklin Sav. Bank* v. *International Trust Co.*, 215 Mass. 231, 233 [1913]); *Childs, Jeffries & Co.* v. *Bright*, 283 Mass. 283, 294 (1933) (where corporate officer used corporate check to pay personal debt, creditor put on inquiry as to authority of officer to do so); *Blacker & Shepard Co.* v. *Granite Trust Co.*, 284 Mass. 9, 14 (1933) (drawee bank liable for cashing checks payable to corporation over unauthorized indorsement of corporate vice-president, where bank made no inquiry into his authority to indorse and receive proceeds); *Santa Maria* v. *Industrial City Bank & Banking Co.*, 326 Mass. 440, 442 (1950) ("a bank on which a check is drawn must at its peril ascertain the identity of the payee of the check"). Compare *Newburyport* v. *Fidelity Mut. Life Ins. Co.*, 197 Mass. 596, 603 (1908) (payee insurance company charged with notice of possible lack of authority of city treasurer who paid premiums on personal life insurance policy with checks drawn on account of city).

[17] The bank's treatment of the checks made payable to its order as bearer instruments was inconsistent with the code's distinction between order and bearer instruments. See *Arvada Hardwood Floor Co.* v. *James*, 638 P.2d 828, 829 (Colo. Ct. App. 1981). Contrast G. L. c. 106, § 3-110(1), inserted by St. 1957, c. 765, § 1 ("[a]n instrument is payable to order when by its terms it is payable to the order or assigns of any person therein specified with reasonable certainty"), with G. L. c. 106, § 3-111, inserted by St. 1957, c. 765, § 1 ("An instrument is payable to bearer when by its terms it is payable to (*a*) bearer or

(1990); *id.* at 29-30 (Holmes, J., concurring). Compare *First Natl. Bank of Boston* v. *Hovey*, 10 Mass. App. Ct. 715, 721 (1980) (check paid over unauthorized signature not properly payable).[18] Because the bank made no such inquiry, we need not decide what depth of inquiry might have been required to discharge the bank's duty before it made any payment on the checks.

The bank raises several defenses to avoid liability for paying these checks, which were not properly payable, to the A.R. Davis account. We discuss these in turn.

A. *The "fictitious payee" (or "padded payroll") rule.*

The fictitious payee rule, G. L. c. 106, § 3-405(1)(*c*), inserted by St. 1957, c. 765, § 1, provides that "[a]n indorsement by any person in the name of a named payee is effective if . . . (*c*) an agent or employee of the maker or drawer has supplied [the maker or drawer] with the name of the payee intending the latter to have no such interest." "This section places the loss on the drawer when an employee supplies him with the name of the payee intending that the named payee have no interest in the check and *an indorsement is forged in the name of the named payee*" (emphasis supplied). *McCarthy, Kenney & Reidy, P.C.* v. *First Natl. Bank of Boston*, 402 Mass. 630, 634 (1988). The effect of the rule is to treat certain fraudulent indorsements as genuine.

The bank argues that the rule applies because Maddalena never intended the bank to have an interest in the checks and because the bank, the named payee, subsequently indorsed the checks. The checks, however, were never fraudulently indorsed. Maddalena presented the checks designating the bank as payee

the order of bearer; or (*b*) a specified person or bearer; or (*c*) 'cash' or the order of 'cash,' or any other indication which does not purport to designate a specific payee").

[18]Maddalena, of course, was not entitled to present the checks for payment. "Presentment is a demand for acceptance or payment . . . by or on behalf of the holder" of an instrument. G. L. c. 106, § 3-504(1), inserted by St. 1957, c. 765, § 1. Here, Maddalena was not a "holder" of the checks because they were not "drawn, issued, or indorsed to him or his order or to bearer or in blank." G. L. c. 106, § 1-201(20), as amended by St. 1983, c. 522, § 3. See G. L. c. 106, § 3-301, inserted by St. 1957, c. 765, § 1 (rights of holder include demanding payment); *General Motors Acceptance Corp.* v. *Abington Cas. Ins. Co.*, 413 Mass. 583, 585 (1992).

to the bank without any indorsement. The bank accepted these unindorsed checks and provisionally credited the proceeds to Maddalena's account. The bank subsequently stamped each check with a Mechanics Bank processing stamp. The parties dispute whether the stamp constituted an indorsement. The dispute is immaterial because the stamp, if regarded as an indorsement, was genuine, the bank being the named payee. "[T]he benefit of [the fictitious payee rule] runs to those who acquire an interest subsequent to the forgery of the indorsement; it does not improve the status of the named payee or of the person who actually executes the indorsement." *Federal Ins. Co.* v. *Groveland State Bank*, 44 A.D.2d 182, 185-186 (N.Y. 1974), modified on other grounds, 37 N.Y.2d 252 (1975) (citing *Pacific Indem. Co.* v. *Security First Natl. Bank*, 248 Cal. App. 2d 75 [1967]). Because the Mechanics Bank checks contained no forged indorsements, the fictitious payee rule does not apply.[19] See *Federal Ins. Co.* v. *Groveland State Bank, supra* (fictitious payee rule not applicable where improperly paid checks contained only the genuine indorsement of the named payee). See also *State of Qatar* v. *First Am. Bank of Va.*, 880 F. Supp. 463, 468 (E.D. Va. 1995) (rule does not apply to checks containing no indorsement); *Pacific Indem. Co.* v. *Security First Natl. Bank, supra* at 92-94 (rule inapplicable where unindorsed check was in fact delivered to named payee bank, which paid check to depositor without verifying his authority to receive funds); *Wright* v. *Bank of Cal.*, 276 Cal. App. 2d 485, 489-490 (1969) (rule inapplicable where bank paid check without any indorsement).[20]

---

[19]This result appears to be consistent with the 1998 amended version of the fictitious payee rule, which applies when "the employee or a person acting in concert with the employee makes a fraudulent indorsement of the instrument." G. L. c. 106, § 3-405(*b*), as appearing in St. 1998, c. 24, § 8.

[20]This conclusion is consistent with the public policy rationale of the fictitious payee rule, which is to place the loss on the party in the best position to prevent it. See *McCarthy, Kenney & Reidy, P.C.* v. *First Natl. Bank of Boston*, 402 Mass. at 634. Contrary to the bank's argument, we consider the bank's position superior to that of the Govonis as far as preventing the diversion of the check proceeds. In this regard, the words of the California Supreme Court are persuasive:

> "[The comments to § 3-405] contemplate that losses resulting from certain fraudulent employee behavior — i.e., causing the issuance of checks to payees intended to have no interest therein — should be risks

## B. *Estoppel.*

The bank argues that the Govonis' negligence in failing to supervise their accountant estops them from asserting the bank's wrongdoing in the first instance. Even if the Govonis were negligent, the bank's contention lacks merit under both the code's provisions and the common law.

We consider first the estoppel-like affirmative defense provided by G. L. c. 106, § 3-406, inserted by St. 1957, c. 765, § 1, which precluded a party whose "negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature . . . from asserting the alteration or lack of authority" against the bank if the bank paid the check "in good faith and in accordance with . . . reasonable commercial standards." This preclusion is unavailable to the bank for two reasons. First, the provision is irrelevant because, as noted earlier, the Govonis do not assert an alteration or unauthorized signature, but an improper disbursal of the check proceeds. See *Bank of S. Md.* v. *Robertson's Crab House,* 39 Md. App. at 722.

Second, we conclude that the payment of the checks violated "reasonable commercial standards,"[21] which strips the bank of

---

of the employer's business and not of the banking community. This conclusion derives from the premise that the employer/drawer is better able to prevent the success of such frauds than the bank; the former may exercise care in selecting and supervising its employees, while the latter is typically presented with checks bearing indorsements forged in a manner that may be difficult if not practically impossible to detect. The comments assume, however, that such checks will never be delivered to the named payees, whether or not such payees are real persons or entities. We perceive this supposition to be critical to the loss allocative function of [§ 3-405]. While it may be less difficult for the employer to prevent the issuance of such checks than for the bank to detect that an indorsement is forged, this is not the relevant comparison when the bank is presented with checks naming it as payee. In the latter circumstance the bank is confronted with an obvious irregularity when the drawer's dishonest employee attempts to negotiate such checks for his own benefit. The bank does not have to be especially vigilant; its agent need only read what appears on the face of the check to be warned that a fraud may be in progress. It is clear therefore that the balance struck under [§ 3-405] has no application in the present context . . . ."

*Sun 'n Sand, Inc.* v. *United Cal. Bank,* 21 Cal. 3d at 696.

[21]The 1998 amended version of § 3-406 uses the term "ordinary care" rather than "reasonable commercial standards," but elsewhere defines the

the ability to invoke the provision even if it were relevant.[22] See *First Natl. Bank of Boston* v. *Hovey*, 10 Mass. App. Ct. at 723-724. There is ample authority finding a failure to comply with "reasonable commercial standards" in these circumstances. Although adherence to such norms is often a question of fact, see *First Natl. Bank of Boston* v. *Hovey, supra* at 721-724; *Bank of S. Md.* v. *Robertson's Crab House, supra* at 714, certain conduct has been considered so unjustified as to be commercially unreasonable as a matter of law. For example, the following situations, quite similar to the case at bar, "have involved clearly unreasonable conduct on the part of the bank: payment of checks with missing indorsements, failure to respect restrictive indorsements, failure to inquire into the authority to sign of one purporting to be an agent, and allowing deposit of a check indorsed by a corporate payee into a personal account" (footnotes omitted). White & Summers, Uniform Commercial Code § 15-5, at 761-762 (3d ed. 1988) (collecting cases). "Two other examples of obviously negligent conduct include payment of checks bearing irregular or incorrect indorsements and honoring a check on which the name of the payee has been visibly altered." *Id.* § 16-7, at 807 n.1 (citations omitted). Likewise, other courts have specifically found that the payment of a check by a payee bank to an unauthorized third party without inquiry by the bank is commercially unreasonable as a matter of law. See, e.g., *Bullitt County Bank* v. *Publishers Printing Co.*, 684 S.W.2d 289, 291-293 (Ky. Ct. App. 1984); *Bank of S. Md.* v. *Robertson's Crab House, supra* at 722; *Master Chem. Corp.* v. *Inkrott*, 55 Ohio St. 3d at 25. See also *Olean Area Camp Fire Council, Inc.* v. *Olean Dresser Clark Fed. Credit Union*, 142 Misc. 2d 1049, 1062 (N.Y. Sup. Ct. 1989) ("In charity we will withhold characterizing such conduct as 'abject stupidity' and call it merely negligence of the grossest kind"). The bank's showing that other area banks, following identical procedures, would also have allowed payment of these checks cannot alone make those procedures reasonable in contemplation of law. An entire industry may behave unreasonably. "[A]lthough the bank ha[s] established that the procedures it ha[s] followed in paying

---

former phrase in terms of the latter in the case of a bank. See G. L. c. 106, §§ 3-103(*a*)(7), 3-406, as appearing in St. 1998, c. 24, § 8.

[22]Inapplicable for the identical reason is another provision relied on by the bank, G. L. c. 106, § 3-419(3), inserted by St. 1957, c. 765, § 1, which also provided a defense in certain situations where the bank acted "in good faith and in accordance with . . . reasonable commercial standards."

the check[s] were common among banks, it ha[s] failed to show that such procedures were reasonable." *First Natl. Bank of Boston* v. *Hovey, supra* at 723, citing *Perley* v. *Glastonbury Bank & Trust Co.*, 170 Conn. 691 (1976).

The bank argues that the vast number of checks a modern bank must rapidly process[23] makes it practically impossible for it to examine all presented checks for such information as the identity of the named payee. While forcefully made, the substance of this argument is called into question by a recent report of the Federal government's Check Fraud Working Group.[24] The report instructs banks to confirm the identity of customers presenting checks,[25] to record identification information on the back of each check,[26] and to train tellers to look for telltale signs of check fraud, including attempts to deposit checks payable to corporations into the accounts of individuals.[27] If for the sake of efficiency banks feel that they must forgo these prudent safeguards, they should also appreciate that they must bear the losses that result as a cost of doing business.

We next consider common law estoppel. Without deciding whether the code has displaced common law estoppel, we conclude that even if not displaced it would not assist the bank. In the context of bank-customer relations, the test for estoppel by negligence was stated in *Jordan Marsh Co.* v. *National Shawmut Bank*, 201 Mass. 397, 408 (1909): "[N]egligence of the maker is immaterial unless it is of a kind that directly and proximately affects the conduct of the banker in the performance of his duties." The Govonis' failure to oversee Maddalena did not directly cause the bank's failure of inquiry, and it has no common law estoppel defense.

---

[23]Here, the bank cites the Federal Expedited Funds Availability Act, 12 U.S.C. §§ 4001-4010, and Federal Reserve Board Regulation CC, 12 C.F.R. § 229, which establish customer fund availability timelines with which a bank must comply, and Article 4A of the Uniform Commercial Code, G. L. c. 106, §§ 4A-101 et seq., concerning wire transfers.

[24]Check Fraud Working Group, Check Fraud: A Guide to Avoiding Losses (Feb. 1999). The Check Fraud Working Group is a subgroup of the interagency Bank Fraud Working Group and includes representatives of the Federal Bureau of Investigation, Department of Justice, Federal Deposit Insurance Corporation, Federal Reserve Board, Internal Revenue Service, Office of the Comptroller of the Currency, Office of Thrift Supervision, U.S. Postal Inspection Service, National Credit Union Administration, and U.S. Secret Service. *Id.*

[25]*Id.* at 3-6, 9, 12.

[26]*Id.* at 6, 12.

[27]*Id.* at 12.

C. *Holder in due course status.*

A holder in due course takes an instrument free from all claims and from all defenses of any party to the instrument with whom the holder has not dealt, except certain so-called "real" defenses. See G. L. c. 106, § 3-305, inserted by St. 1957, c. 765, § 1. The bank asserts that it qualifies as a holder in due course and is therefore protected from liability to the Govonis. We disagree.

A holder in due course under the original code was a holder who took an instrument for value, in good faith, and without notice that it was overdue, had been dishonored, or was subject to any defense or claim to it on the part of another. See G. L. c. 106, § 3-302(1), inserted by St. 1957, c. 765, § 1. Generally under the Uniform Commercial Code, "[a] person has 'notice' of a fact when (*a*) he has actual knowledge of it; or (*b*) he has received a notice or notification of it; or (*c*) from all the facts and circumstances known to him at the time in question he has reason to know that it exists." G. L. c. 106, § 1-201(25), inserted by St. 1957, c. 765, § 1.[28] Specific to the holder in due course context, under G. L. c. 106, § 3-304(1)(*a*), inserted by St. 1957, c. 765, § 1, a party was regarded as having notice if "the instrument is . . . so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay."[29] Here, the bank had reason to know that the checks it received designated it as payee, and it failed to discharge its duty to inquire into the presenter's authority to receive the proceeds. See *Bank of S. Md.* v. *Robertson's Crab House*, 39 Md. App. at 722. The checks on their face left unanswered the critical question whom to pay and thus put the bank on notice of the Govonis' claim against the checks. Cf. *Medeiros* v. *Fellsway Motors, Inc.*, 326 Mass. 656, 658 (1951) (holder charged with notice of what appears on face of instrument); *First Natl. Bank of Cape Cod* v. *North Adams Hoosac Sav. Bank*, 7 Mass. App. Ct. 790, 795-796 (1979). The bank therefore does not qualify as a holder in due course, and in so deciding, we join a number of other courts reaching the same

---

[28]This language was unchanged by St. 1998, c. 24, § 8.

[29]The 1998 amendments to the code, among other changes to the holder in due course provisions, eliminated the reference to "an ambiguity as to the party to pay." See G. L. c. 106, § 3-302(*a*)(1), as appearing in St. 1998, c. 24, § 8. It is not clear to us that the omission would have any bearing on the outcome here.

result on similar facts. See, e.g., *Sun 'n Sand, Inc.* v. *United Cal. Bank*, 21 Cal. 3d at 689-690; *Douglass* v. *Wones*, 120 Ill. App. 3d 36, 45-46 (1983); *Allis Chalmers Leasing Servs. Corp.* v. *Byron Center State Bank*, 129 Mich. App. 602, 607-609 (1983); *Dalton & Marberry, P.C.* v. *NationsBank, N.A.*, 982 S.W.2d at 235.[30]

D. *Comparative negligence and indemnification.*

After finding the bank liable in negligence on the Mechanics Bank checks, the trial judge also found the Govonis to have been twenty-five percent negligent in failing to oversee their accountant, and applied the comparative negligence statute, G. L. c. 231, § 85, to reduce the defendant's liability to seventy-five percent of the total. The bank argues that this allocation was clear error, and that the Govonis were over fifty percent negligent, which under the statute places all of the loss on the Govonis. However, we agree with the Govonis that the statute is inapplicable.

First, a claim for wrongful debit of items not properly payable under G. L. c. 106, § 4-401, is one of strict liability. See *Ambassador Financial Servs., Inc.* v. *Indiana Natl. Bank*, 605 N.E.2d 746, 751 (Ind. 1992); *Pamar Enters., Inc.* v. *Huntington Banks of Mich.*, 228 Mich. App. 727, 736 & n.6 (1998); *Woods* v. *MONY Legacy Life Ins. Co.*, 84 N.Y.2d 280, 283 (1994), citing *Putnam Rolling Ladder Co.* v. *Manufacturers Hanover Trust Co.*, 74 N.Y.2d 340, 345 (1989); *Medford Irr. Dist.* v. *Western Bank*, 66 Or. App. 589, 595 (1984). It is settled that the comparative negligence statute does not apply to strict liability claims. See *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 353 (1983).

Second, the comparative negligence statute is "displaced by the particular provisions" of the code. G. L. c. 106, § 1-103. Cf. *Arkwright Mut. Ins. Co.* v. *State St. Bank & Trust Co.*, 428 Mass. 600, 604-606 (1998). Against the strict liability of the wrongful debit action retained by § 4-401, the code provided

---

[30]The bank relies on *Rhode Island Hosp. Trust Natl. Bank* v. *Zapata Corp.*, 848 F.2d 291, 295 (1st Cir. 1988), in arguing that individual scrutiny of each check is too onerous a burden for banks to shoulder. That case is inapposite because it dealt with a bank's duty to examine drawer signatures for forgeries, not with the proper disbursement of the proceeds of checks that on their face are payable to the bank. Detecting a forgery may be an inherently difficult and imprecise process requiring handwriting experts in extreme cases, whereas it takes no particular expertise for a bank to determine whether a check presented to it is also payable to it.

affirmative defenses that incorporated concepts of negligence. See *McCarthy, Kenney & Reidy, P.C.* v. *First Natl. Bank of Boston*, 402 Mass. at 633. For example, as discussed above, § 3-406 allowed a bank that followed "reasonable commercial standards" to preclude a plaintiff whose negligence substantially contributed to the making of a material alteration or unauthorized signature from asserting the alteration or lack of authority against the bank. Similarly, G. L. c. 106, § 4-406(3), inserted by St. 1957, c. 765, § 1, denied a bank that failed to use ordinary care the defense that the plaintiff customer failed to exercise reasonable care in examining periodic statements of account. These provisions expressed a form of contributory negligence whereby the bank, if at all negligent, may have been liable regardless of the plaintiff's own negligence. See *First Natl. Bank of Boston* v. *Hovey*, 10 Mass. App. Ct. at 723; White & Summers, Uniform Commercial Code § 16-7, at 806-807 (3d ed. 1988). The original code's dual reliance on notions of strict liability and contributory negligence in allocating liability between drawer and drawee left no room for a comparative negligence standard. See *Federal Ins. Co.* v. *NCNB Natl. Bank of N.C.*, 958 F.2d 1544, 1550-1552 (11th Cir. 1992) (applying Florida law); *Putnam Rolling Ladder Co.* v. *Manufacturers Hanover Trust Co.*, supra at 348 ("[t]he importation of comparative negligence into the UCC — which was drafted before widespread acceptance of comparative fault — is not without its advocates . . . but has generally been rejected by both courts and commentators"), citing White & Summers, supra § 16-7, at 809 n.6.[31]

For similar reasons, the bank is not entitled to common law indemnification from the Govoni treasurers. The code's carefully devised allocation of liability must be seen to displace common law indemnification just as it displaces comparative negligence.[32]

---

[31]The 1998 amended version of the code adopted comparative negligence under § 3-406. See G. L. c. 106, § 3-406, as appearing in St. 1998, c. 24, § 8. See also White & Summers, Uniform Commercial Code § 19-1, at 239 (4th ed. 1995). The amendment was a change to, not a clarification of, the prior code.

[32]Even were the doctrine not displaced, we doubt that common law indemnification would apply in favor of the bank. "Only in exceptional cases . . . has indemnity been allowed to one who was not free from fault. . . . [Where] indemnity has been allowed to a negligent indemnitee, the indemni-

2. *Checks payable to the Commonwealth or the DES.* The defendant for similar reasons is also liable for its improper disbursal of the proceeds of the Commonwealth/DES checks. Maddalena was not entitled to payment on those checks because they were not "drawn, issued, or indorsed to him or his order or to bearer or in blank." G. L. c. 106, § 1-201(20), as amended by St. 1983, c. 522, § 3. See generally 9 C.J.S. Banks & Banking § 342 (1996) ("Where a check designates a payee, the bank generally may charge the customer's account only if payment is made to such payee or the payee's indorsee"); *id.* § 343 ("[t]he payment of such a check to one other than the payee, without a valid indorsement of the payee, is at the risk of the bank").[33]

At trial the bank successfully invoked the defense of commercial reasonableness under § 3-406. The judge found that the Govonis' negligence in dealing with their accountant substantially contributed to the fraudulent scheme, and that the bank followed "reasonable commercial standards" in paying the checks. The latter finding was based on the policy of the bank, identical to that of comparable local banks, of paying out tax checks made to the order of the Commonwealth or the DES, even without payee indorsements, to protect customers from late tax payment penalties. Were the checks in fact presented by the named payees, this practice would not expose the bank to liability. See *Gordon* v. *State St. Bank & Trust Co.*, 361 Mass. 258, 260-261 (1972) (payment over forged indorsement not basis for recovery by drawer where intended payee received payment). But here the bank failed to conduct even the most basic of inquiries into whether the checks were in fact presented

tee's negligence has been insignificant in relation to that of the indemnitor." *Rathbun* v. *Western Mass. Elec. Co.*, 395 Mass. 361, 364 (1985). We do not perceive the bank's fault, in making no effort to ensure the check proceeds were not improperly paid out, to be insignificant compared to the negligence of the Govonis. The case relied on by the bank, *Boston Woven Hose & Rubber Co.* v. *Kendall*, 178 Mass. 232, 236-237 (1901), is distinguishable because it is a products liability case where the negligent indemnitee justifiably relied on the warranty or representations of the negligent indemnitor, thus falling within the category of exceptional cases mentioned in *Rathbun.*

[33]Moreover, the conclusion that these checks were not properly payable follows logically from the rule that a check presented under an unauthorized or forged indorsement is not properly payable, see *First Natl. Bank of Boston* v. *Hovey*, 10 Mass. App. Ct. at 721, coupled with the rule that a missing indorsement is treated as an unauthorized indorsement, see *Arkwright Mut. Ins. Co.* v. *State St. Bank & Trust Co.*, 428 Mass. at 602-604.

by an agent of the Commonwealth or deposited to an account of the Commonwealth. This failure invites fraud against both the Commonwealth and the bank's depositors, and is commercially unreasonable as a matter of law.[34]

3. *The Govonis' chapter 93A claims.* The Govonis' claims under G. L. c. 93A, § 11, that the bank engaged in unfair or deceptive acts were properly rejected by the judge. Even if the bank is characterized as negligent, this by itself does not amount to a chapter 93A violation. See *Glickman* v. *Brown*, 21 Mass. App. Ct. 229, 234 (1985). The bank was merely following procedures that, although resulting in improper payment, were widely utilized by similar banks in the area. No act of the bank fits within a common law conception of unfairness or was "immoral, unethical, oppressive, or unscrupulous." *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979), quoting from 29 Fed. Reg. 8325, 8355 (1964).

4. *Summary.* We conclude that the bank wrongfully debited plaintiffs' account when, without any inquiry into Maddalena's authority, it paid to him the proceeds of the Mechanics Bank checks. The bank's defenses based on the "fictitious payee" rule, estoppel, holder in due course status, and common law indemnification are all without merit. Moreover, the trial court erroneously applied the comparative negligence statute to reduce the Govonis' recovery. The bank is fully liable to the Govonis for the Mechanics Bank checks, which totaled $503,352.08. The bank is also liable to the Govonis for improperly debiting their account for the Commonwealth/DES checks, which totaled $147,422.89. The Govonis' chapter 93A claims are without merit.

Accordingly, the trial court's amended judgment is to be modified by eliminating the prefatory paragraph that includes the reference to the reduction for the plaintiffs' comparative

[34]There is widespread authority that "payment of checks with missing indorsements" involves "clearly unreasonable conduct on the part of the bank." White & Summers, Uniform Commercial Code § 15-5, at 761 & n.12 (3d ed. 1988) (collecting cases). See *Tonelli* v. *Chase Manhattan Bank, N.A.*, 41 N.Y.2d 667, 670 (1977) (bank disregarded reasonable commercial practice in issuing cashier's check in exchange for unindorsed certified check not payable to the presenter); Annot., Bank's "Reasonable Commercial Standards" Defense Under UCC § 3-419(3), 49 A.L.R.4th 888, 893, 911-914 (1986 & Supp. 2000) (collecting cases holding it commercially unreasonable as matter of law to pay checks over missing indorsements).

Govoni & Sons Construction Co., Inc. *v.* Mechanics Bank; Maddalena.

negligence, by striking the figure $384,514.06 and inserting in its place the figure $650,774.97, and by making appropriate adjustments in interest. As so modified, the judgment is affirmed.

*So ordered.*